**Patricia HENNESSY, Plaintiff–Appellee, Cross–Appellant,**

v.

**PENRIL DATACOMM NETWORKS, INCORPORATED and Richard Burns, Defendants–Appellants, Cross–Appellees.**

**Nos. 94–3475, 94–3565 and 94–3868.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1995.

Decided Nov. 13, 1995.

---

Elizabeth Hubbard (argued), John C. O'Connor, Chicago, IL, for Patricia Hennessy.

Malcolm S. Kamin, Abramson & Fox, Chicago, IL, Ginger McGaffie, Penril Datacomm Networks, Incorporated, Vienna, VA, Ginger McGuffie (argued), McGuffie & Handal, Vienna, VA, for Penril Datacomm Networks, Incorporated.

Gwendolyn Young Reams, John P. Rowe, Carolyn L. Wheeler, Gail S. Coleman, Equal Employment Opportunity Commission, Office of General Counsel, Washington, DC, for Equal Employment Opportunity Commission, Amicus Curiae.

Malcolm S. Kamin, Abramson & Fox, Chicago, IL, for Richard Burns in No. 94–3565.

Before BAUER, COFFEY, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

A hotly contested trial, especially one raising explosive issues like claims of discrimination, often produces significant factual evidence capable of being interpreted in more than one way. Patricia Hennessy's suit against Penril Datacomm Networks, Inc. was such a case. A jury heard the case for ten days in 1994. Penril, which generally lost the battle below, is now here looking for relief from the judgment.

Appellate courts, viewing the sort of claims Penril is now making, must be mindful of their limited role in reviewing factual determinations made by juries and trial judges. And the discharge of those duties is not aided by the kind of partisan statement of facts laid out by Penril in its brief. After reading Penril's version of the facts one has to wonder not only how Hennessy ever got the jury to see the case her way but how she avoided getting tagged with sanctions under Rule 11 as well. Penril's statement of facts, it seems to us, is more like a reiteration of its closing argument to the jury. The jury rejected Penril's view of the facts, and so do we. Instead, we view all facts in the light most favorable to Ms. Hennessy.

Penril sells computer hardware, such as modems and networking equipment for computer communications. The company, headquartered in Gaithersburg, Maryland, maintains a staff of sales and support personnel throughout the United States. Ms. Hennessy, who holds a Masters Degree in Communications from Northwestern University, was hired by Penril in 1988 to do sales work out of its office in Rockford, Illinois. The employment relationship was to last a little less than four years.

Richard Burns supervised Hennessy during her first three months with Penril. She then was supervised, for the next three years, by Terry McFadden. While under McFadden, however, Hennessy continued to see Burns every now and then, although he worked in a different part of the country. Burns returned as Hennessy's supervisor in July of 1991 and remained in that spot until Hennessy was terminated in April of 1992.

Two incidents involving Burns when he was not Hennessy's supervisor are prominently mentioned in the evidence. In the summer of 1990, a number of Penril employees were in Portland, Oregon, on business. One evening, Burns took McFadden, Hennessy, another sales rep, Judy Marshall, and two other men (whether or not they also worked for Penril is unclear) to a striptease bar on the outskirts of town. During a "performance," Burns and other male customers began yelling and cheering for Hennessy and Marshall, the only women in the bar who were not entertainers, to get up on stage and perform with the bar's dancers. They didn't. As the group drove home, Burns mentioned how other women's breasts compared with the breasts of the dancers. Hennessy says she was uncomfortable during the evening and got the impression that Burns viewed her and other women as sex objects.

The second incident occurred in connection with a Penril Christmas party in December of 1990 at the Stouffer hotel in Seattle, Washington. After the party broke up, Burns invited Hennessy to join him for a drink in the hotel's cocktail lounge. After

some chitchat, Burns engaged Hennessy in a conversation and confessed to her that he was no longer sexually attracted to his wife, but that he had always found Hennessy, who he said was intelligent, to be very sexually attractive. He said he was sexually attracted to her, but Hennessy did not take the bait. She said her marriage was happy, and the topic was abandoned. The conversation, Hennessy said, left her feeling "very uncomfortable."

Hennessy became pregnant in March of 1991, but she kept the news to herself because she thought it might make her "life very difficult at Penril." Her feelings were arguably justified because the philosophy at Penril, according to some of the testimony at trial, was that sales reps were expected to "get up and put on their suits and tie and go to the office."

In July of 1991, Burns replaced McFadden as Hennessy's supervisor. As a farewell note to Hennessy, McFadden sent her a letter on July 16, 1991, which said:

Dear Pat:

I want to take a moment to express my appreciation for your efforts on behalf of Penril's Western Area, over the last three years. You have been an important part of Penril's remarkable recovery in an unforgiving market.

Thanks to District Sales Managers like you, Penril Datacomm Networks will again set new company records in sales and profitability.

I have enjoyed working with you and hope that the new changes will offer you new dynamic opportunities.

Again Pat, thanks for the past three years and good luck in the coming fiscal year.

In August of 1991, Burns saw Hennessy, who by this time was obviously pregnant, at a sales meeting at Penril's headquarters in Maryland. He said he was surprised to see her pregnant because he always thought she was a "career woman." According to other testimony during the trial, Dave Johnson, Penril's president, stated around this time that he does not like to hire women in the field because they get pregnant.

After the August sales meeting in Maryland, Burns asked Hennessy to come to Dallas to help him train two new male sales reps. Hennessy went to Dallas, but when the work was done she was not invited to accompany Burns and the two men on Burns' sailboat because he did not think it was a place for pregnant women to be.

Hennessy gave birth on November 6, 1991, and took maternity leave from that day until January 2, 1992. Prior to taking the leave, Hennessy's sales numbers generally ranked her second among Burns' four sales reps. When Hennessy returned to work, Burns told her she was on probation. She says she repeatedly tried, without success, to discuss her probationary status with Burns. Meanwhile, Burns was writing memoranda critical of Hennessy's performance to his supervisor, to Penril's human resources department, and to Hennessy's personnel file. Hennessy was not told that the negative reports were filed.

Penril's lease for its Rockford office, the one where Hennessy worked, expired at the end of February 1992. Burns decided not to renew the lease but never told Hennessy of the decision. Then on February 25, 1992, Hennessy learned she had three days to vacate her office. On this short notice, Hennessy was forced to move her office files to the basement of her home, where she continued her duties for Penril without the aid of telephone answering, computer, secretarial, or photocopying services. She was, at that time, the only Penril sales rep, out of about 35, without an outside-the-home office.

Finally, in March 1992, Burns decided to terminate Hennessy. The decision was approved by Sean Belanger, his supervisor, and by Mr. Johnson. Hennessy, unaware that her fate had been decided, wrote to Burns on March 27, 1992, voicing concerns about her probationary status and what she believed to be sex discrimination. Eleven days later, on April 7, 1992, Burns met with Hennessy at a hotel in Rosemont, Illinois, and fired her. Burns subsequently hired a male sales rep to replace Hennessy and moved him into an office in Oak Brook, Illinois.

Hennessy's suit against Penril and Burns raised allegations of, among other things, sex and/or pregnancy discrimination in violation

of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. 42 U.S.C. § 2000e *et seq.* The jury returned a verdict finding that as to both Penril and Burns, sex was a motivating factor in the decision to terminate Hennessy. The jury awarded Hennessy no compensatory damages, but it found that both Penril and Burns acted with malice or reckless indifference to her rights. Punitive damages were assessed against Penril at $300,000 and against Burns at $50,000.

In his decision on motions after the verdict, Judge Alesia awarded Hennessy back pay and ordered Penril to reinstate her as an employee. Burns, because the court concluded that Title VII does not cover supervisor liability, was dismissed from the case. The court also reduced the punitive damage assessment against Penril to $100,000 and granted Ms. Hennessy's petition for attorney's fees and costs.

On appeal, Penril asserts that it was improperly subjected to retroactively increased liability for past conduct; that the district court erred in refusing to vacate the punitive damage award; that without a jury finding of "but for" causation, Hennessy did not qualify for damages or other relief under Title VII; and that the district court erred by awarding unreasonable and excessive attorney's fees. In her cross-appeal, Hennessy maintains that the district court erred by so greatly reducing the punitive damage award against Penril.[1]

■ Penril's first claim is that it was improperly subjected to retroactively increased liability for past conduct because the trial court allowed Hennessy to present evidence regarding events that occurred prior to November 21, 1991—the effective date of the 1991 Civil Rights Act. As it has throughout this litigation, Penril again submits that the jury should not have been permitted to hear any evidence of Penril's "pre-Act" conduct. Penril asserts that to allow consideration of

this evidence violates the Supreme Court's decision against retroactivity in *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Hennessy, of course, contends that the jury properly heard the evidence. We agree with Hennessy.

In *Landgraf,* the Supreme Court stated that "[t]he new damages remedy in § 102 [of the Civil Rights Act of 1991] . . . is the kind of provision that does not apply to events antedating its enactment in the absence of clear congressional intent [which the court does not find]." —— U.S. at ——, 114 S.Ct. at 1506. *Landgraf,* however, focuses on adverse employment decisions made and communicated before the 1991 Act became effective, not on what kind of evidence can be introduced at trial to show discriminatory motive in an adverse employment decision made after the Act took effect. In this case, the adverse employment decision, Hennessy's termination on April 7, 1992, occurred some five months after the 1991 Act took effect. To read *Landgraf* as Penril urges would drop an iron curtain on November 21, 1991, shielding from view all evidence before that day. That would be an absurd situation as it would keep from the jury substantial evidence that could aid it in reaching a just verdict. The district court properly held that *Landgraf* did not prohibit the jury from hearing about pre-Act conduct of Penril and its agents which provided context and background regarding Hennessy's termination in April 1992.

■ Next, Penril submits that absent a jury finding of "but for" causation, Hennessy does not qualify for damages or relief under 42 U.S.C. § 2000e–5(g)(2)(A). First, Penril contends, the trial court improperly instructed the jury as to the burden of proof and "but for" causation when it rejected three jury instructions it proposed.

■ Our review of jury instructions is generally limited to determining whether

---

1. Hennessy also appealed the district court's dismissal of Burns and the setting aside of the verdict against him. However, in her reply brief to this court, Hennessy agreed that, in light of our decision in *EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276 (7th Cir.1995), the district court properly dismissed Burns from the

suit. Hennessy's counsel said she would file the appropriate motion to dismiss this aspect of her cross-appeal. Although *AIC Security* involved claims under the Americans With Disabilities Act, we assume Hennessy will follow up on her intention and that we need not consider any issues pertaining to Mr. Burns' liability.

"the instructions as a whole were sufficient to inform the jury correctly of the applicable law." *Maltby v. Winston*, 36 F.3d 548, 560 (7th Cir.1994) (citation omitted). We look first at whether the instructions misstate or insufficiently state the law. If they do, we then determine whether misstatements "confused or misled the jury causing prejudice to a litigant." *Id.*, citing *Doe v. Burnham*, 6 F.3d 476, 479 (7th Cir.1993).

The district court instructed the jury that to succeed on her discrimination claims, Hennessy had to prove that the defendants intentionally discriminated against her—that her sex was a "motivating factor" in the decision to terminate her. This instruction, taken from 42 U.S.C. § 2000e–2(m), provides in relevant part:

> [A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

Penril argues that the trial court analyzed this case as a "pretext" case, and erred when it failed to instruct the jury on the familiar burden-shifting method of proving intentional discrimination by indirect evidence, originally set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Penril's arguments are unpersuasive. We believe the trial court properly instructed the jury regarding the causation element required under Title VII, as amended by the 1991 Act. A violation of Title VII is established if a plaintiff can prove by a preponderance of the evidence that discrimination was a motivating factor in the employment decision. 42 U.S.C. § 2000e–2(m). If the employer proves that it would have made the same decision "in the absence of the impermissible motivating factor," *see* 42 U.S.C. § 2000e–5(g)(2)(B), it is not absolved of violating Title VII, for such a finding only serves to limit the plaintiff's remedies to declaratory and injunctive relief and limited attorney's fees and costs, *see* 42 U.S.C. § 2000e–5(g)(2)(B)(ii).

In denying Penril's motion for judgment as a matter of law at the close of plaintiff's case, the district court found the case to be a "mixed bag" of direct and indirect evidence. Contrary to Penril's assertion, the trial court did not analyze this case solely as an indirect evidence case subject to the *McDonnell Douglas* burden-shifting methodology. And Hennessy did not—correctly, we believe—argue for a proposed jury instruction using the *McDonnell Douglas* indirect evidence methodology. She proceeded instead by attempting to prove intentional discrimination based on gender and her pregnancy through direct evidence. A review of the record reveals ample evidence of discriminatory intent by Penril which is direct evidence of discrimination under the standards we set out in *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736–37 (7th Cir.1994).

Furthermore, even had Hennessy sought to prove discrimination using the *McDonnell Douglas* method of indirect proof, it would not have been appropriate to include that methodology in a jury instruction. It is well-established in this circuit that the burden-shifting methodology should not be used during the jury's evaluation of evidence at the end of a trial on the merits:

> Once the judge finds that the plaintiff has made the minimum necessary demonstration (the "prima facie case") and that the defendant has produced an age-neutral explanation, the burden-shifting apparatus has served its purpose, and the only remaining question—the only question the jury need answer—is whether the plaintiff is a victim of intentional discrimination.

*Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir.1994); *see also Jardien v. Winston Network, Inc.*, 888 F.2d 1151 (7th Cir.1989) (particular method of proof is irrelevant, the main issue is whether plaintiff's age was a determining factor in defendant's decision to terminate); *cf. U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 713–14, 103 S.Ct. 1478, 1480–81, 75 L.Ed.2d 403 (1983) ("Because this [Title VII race discrimination] case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a prima facie case. We think that by framing the issue in these terms, they have unnecessarily evaded the ultimate question of discrimination *vel*

*non.*" (Footnote omitted.)) Suffice to say, whether Ms. Hennessy's sex was a motivating factor in Penril's decision to fire her was the dispositive issue. The instructions were sufficient to correctly inform the jury of the applicable law. It was not error for the district court to reject Penril's proposed jury instructions on the point.

 Next, Penril contends that the district court erred in awarding Hennessy back pay and reinstatement. Penril asserts Hennessy was required to prove "but for" causation as a prerequisite to obtaining back pay pursuant to 42 U.S.C. § 2000e–5(g)(2)(A). This assertion is mistaken. The 1991 Civil Rights Act amended Title VII to include an affirmative, but for, defense for the employer. If an employer proves that the same employment decision would have been made absent an illegal motivation, a plaintiff's remedies are limited. 42 U.S.C. § 2000e–5(g)(2)(B). In short, the 1991 Act provides that to avoid back pay and reinstatement, the employer, not the employee, must demonstrate that the employment decision would have occurred absent the impermissible motivating factor. In this case, in order to limit Hennessy's remedies, the burden was on Penril to prove that it would have terminated Hennessy for valid reasons even though discrimination was also present. Penril did not do this, nor did it submit a proposed verdict question containing a "but for" inquiry for the jury. Given this state of the record, Penril must lose on this point. The award of back pay, which totals $140,191.36, and the reinstatement order were appropriate.

If we were reviewing Penril's claims in normal sequence, we would now take up its contentions regarding the issue of punitive damages. But Hennessy also raises questions about punitive damages in her cross-appeal, so we'll skip the subject now and take it up later. We turn next to Penril's objections regarding attorney's fees.

 In suits under the 1991 Civil Rights Act, a prevailing party may recover reasonable attorney's fees. As the prevailing party below, Hennessy petitioned the court for $141,817.12 in attorney's fees and $9,149.26 in costs. Penril objected to the petition, arguing that the amount requested was excessive and unreasonable. The parties submitted briefs and affidavits on the issue which the district court considered. The district court reduced the amount of the petition slightly and awarded Hennessy $137,297.50 in attorney's fees and $8,648.71 in costs.

 We review an award of attorney's fees for an abuse of discretion. *Smith v. Great American Restaurants, Inc.,* 969 F.2d 430, 439 (7th Cir.1992). Reviewing the record in this matter, it is plain that the district court did not abuse its discretion. After careful review and analysis of the parties' submissions, including detailed records and affidavits, the district court found the request to be generally reasonable. In his very comprehensive and well-reasoned decision, Judge Alesia provided a clear and concise explanation of why the fees and costs, with a slight reduction, were reasonable and not excessive. His findings were not clearly erroneous and we see no abuse of discretion, so we move now to our last stop, questions about the issue of punitive damages.

 Like the compromise brokered by Vito Corleone with his rival dons—drugs would be permitted, but controlled—the 1991 Civil Rights Act contains a compromise on punitive damages. For the first time, they are permitted, but they are controlled. Punitive damages and compensatory damages, new forms of damages in civil rights cases under Title VII, are capped. *See* 42 U.S.C. § 1981a(b)(3). As we previously noted, the jury assessed punitive damages against Penril at $300,000. On motions after verdict the district court cut the number back to $100,000. Hennessy, in her cross-appeal, argues that they should have only been rolled back to $200,000. Penril argues that Hennessy is not entitled to any punitive damages because the jury denied her an award of compensatory damages, and that in any event the evidence was insufficient to establish entitlement to punitive damages.

Citing a host of cases—*McGrew v. Heinold Commodities, Inc.,* 147 Ill.App.3d 104, 100 Ill.Dec. 446, 497 N.E.2d 424 (Ill.App. 1 Dist., 1986); *Florsheim v. Travelers Indem. Co. of Illinois,* 75 Ill.App.3d 298, 30 Ill.Dec. 876, 393 N.E.2d 1223 (Ill.App. 1 Dist., 1979); *Tonchen*

*v. All–Steel Equipment Inc.,* 13 Ill.App.3d 454, 300 N.E.2d 616 (Ill.App. 2 Dist., 1973), *cert. denied,* 71 Ill.2d 518; and *Kemner v. Monsanto Co.,* 217 Ill.App.3d 188, 160 Ill. Dec. 192, 576 N.E.2d 1146 (Ill.App. 5 Dist., 1991), *cert. denied,* 142 Ill.2d 655, 164 Ill.Dec. 918, 584 N.E.2d 130, among them—Penril draws on the familiar tort mantra that "[p]unitive damages may not be assessed in the absence of compensatory damages." Although even Illinois law on this subject may have a few cracks, as we noted in *By–Prod Corp. v. Armen–Berry Co.,* 668 F.2d 956, 961 (7th Cir.1982), citing *McNay v. Stratton,* 9 Ill.App. 215 (Ill.App. 2 Dist., 1881), *appeal dismissed,* 109 Ill. 30 (1884), reliance on Illinois common law in this case is misplaced.

This case, of course, is a federal civil rights action brought pursuant to Title VII, 42 U.S.C. § 2000e *et seq.* It is governed by the damage provisions of Title VII and 42 U.S.C. § 1981a. It does not concern whether punitive damages are available under state law for a violation of state law. An analysis of Illinois common law, as urged by Penril, is just not relevant to the issue of whether punitive damages are available in this case.

Title 42, U.S.C. § 1981a defines damages in cases of intentional discrimination in employment. Subsection (b) provides in pertinent part:

> A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

Nothing in the plain language of § 1981a conditions an award of punitive damages on an underlying award of compensatory damages. Penril's effort to apply general Illinois tort law to a federal civil rights case invoking 42 U.S.C. § 1981a is particularly inappropriate because the statute prohibits consideration of back pay by a jury as an element of compensatory damages. Thus, unlike compensatory damages at common law, compensatory damages under § 1981a are defined to omit the most obvious economic damages in a wrongful discharge case—back pay.

The 1991 Act allows compensatory damages in addition to those already provided by the Civil Rights Act of 1964. Back pay is excluded from compensatory damages under § 102 of the 1991 Act "to prevent double recovery." *Landgraf,* —— U.S. at ——, 114 S.Ct. at 1491. For that reason, the district court instructed the jury that it was not to award back pay as an element of compensatory damages. Following the statutory scheme, the court determined the back pay award after the jury found that Penril discriminated against Hennessy. Judge Alesia also correctly observed on motions after the verdict that the back pay award was properly thought of as compensatory damages because it was "compensation for injury at the hands of defendants...." *Hennessy v. Penril Datacomm Networks,* 864 F.Supp. 759, 763 (N.D.Ill.1994). As evidenced by the court's award of back pay, Hennessy was clearly injured when she was unlawfully terminated. Especially considering the trial court's award of back pay, the jury's consideration of the issue of punitive damages was appropriate, even though it did not award compensatory damages.

Penril's argument that the evidence is insufficient to support an award of punitive damages and Hennessy's objection regarding the extent those damages were reduced are, to a certain extent, intertwined. So we will mix the two contentions up a bit as we move to resolve the issues.

 It is, of course, beyond dispute that a punitive damage award is appropriate in certain cases to punish a wrongdoer for outrageous conduct and to deter others from engaging in similar conduct. An award of punitive damages, however, must be supported by the record and may not constitute a windfall to the prevailing party. *Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1314 (7th Cir.1985), citing *McKinley v. Trattles,* 732 F.2d 1320, 1327 (7th Cir.1984).

 Hennessy's case does not rest on a classic claim of sexual harassment; she claims she was terminated on account of her gender and because of her pregnancy. Yet a

smidgin of what may be a claim of sexual harassment is lurking here because, as part of her argument for punitive damages, Hennessy points to the events in Portland and Seattle in 1990 concerning Mr. Burns. These events—the trip to the striptease bar and the poorly camouflaged proposition in the lounge after the Christmas party—and the legal significance that attaches to them bring to the fore the difficult question of what sort of sexual interaction between men and women is legally permissible in the workplace as we approach the end of the twentieth century. While this is not the time or place to delve into a lengthy discussion about the subject, a few general observations, we believe, are appropriate.

Studies tell us that many women, especially those who have spent substantial time in the work force, believe they have at one time or another been the subject of some sort of sexual harassment. The stories of harassment are as varied as the women who tell them. Judge Alex Kozinski of the United States Court of Appeals for the Ninth Circuit tells of the lawyer whom he knows well who put herself through school waiting tables at a Hungarian restaurant, where the owner's son often took the opportunity to grope her as she passed through the kitchen with her arms full of food. "You learn to wriggle past him without spilling the goulash," she explained.

Women deal with sexual harassment in the workplace in different ways. Some quit, while others, if the harasser is not the boss, appeal to a higher authority within the company. Others endure or learn, as Judge Kozinski notes, to "wriggle without spilling the goulash."

Sexual harassment in the workplace raises sensitive and complex concerns. For courts, these concerns are often competing. On one hand, we should not be in the business of throwing a wet blanket over activities that can lead to consensual amour. On the other hand, a major purpose of Title VII is to immunize the workplace from sexual intimidation and repression.

In 1994, Warner Bros. presented Demi Moore aggressively pursuing Michael Douglas in its movie, "Disclosure." The situation depicted in the movie, however, is atypical. The lion's share of sexual harassment situations features the man as the harasser and the woman as the harassee. But in the workplace, what is fair and what is foul? The extremes are easy; "Have sex with me or you're fired" lands deep in foul territory, but "I like your dress" is a fair ball. Deciding between the extremes is not an easy task today, and it won't get any easier to do in the future. As the work force grows and people spend more of their time at work, the workplace inevitably becomes fertile ground for the dating and mating game. It is certainly not unusual, and it may even be desirable, for love to bloom in the workplace. Contiguity can lead to sexual interest, which can lead to soft music, candlelight dinners, serious romance, and marriage, or any stops along the way. And more often than not, still at this moment in time, it is the man who usually makes the first move. Within this context, we look to what happened between Hennessy and Burns in Portland and Seattle in 1990.

Although Hennessy probably wishes she had stayed behind, it is undisputed that nobody dragged her kicking and screaming to the striptease bar in Portland. While Burns' actions in the bar, accepting Hennessy's view of them, were boorish, as were his comments on the way home, it was, from the evidence in this case, an isolated incident of bad taste. On the state of this record, even Hennessy does not argue that Burns was some sort of an overbearing sexist. The not-so-veiled proposition in the lounge in Seattle was a different sort of event. While Burns might have been a louse for saying unkind things about his wife and for being a married man trying to get something going with a married woman, that was really all he did, and Hennessy wasn't interested.

It is somewhat interesting to note that had Hennessy voluntarily become romantically involved with Burns and her fellow sales reps complained that she was receiving preferential treatment, they probably would have had no recourse under Title VII. The EEOC has stated that "[n]ot all types of sexual favoritism violate Title VII. . . . Title VII does not prohibit . . . preferential treatment based upon consensual romantic relationships. An

isolated instance of favoritism toward a 'paramour' (or a spouse, or a friend) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders." *See* EEOC Policy Guidance on Employer Liability Under Title VII for Sexual Favoritism, EEOC Notice No. 915–048 (January 12, 1990).

Because there is no evidence that Burns ever followed up on his proposition—we are confident Hennessy would have told the jury about it if he had—we can only conclude that Burns accepted Hennessy's turn-off and that he never tried to work that field again. The sexual approach he tried in 1990 was an isolated incident.

■ The Portland and Seattle incidents, as we view them, are not the sort of things that could support a jury finding of liability, much less an award of punitive damages. If this were all Hennessy had to go on, the award of punitive damages in her favor, and in fact the judgment in favor, would have to be vacated. But we are, of course, bound to ascertain whether *all* evidence presented, "combined with all reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict." *Mathewson v. National Automatic Tool Co.*, 807 F.2d 87, 90 (7th Cir.1986). Fortunately, for Hennessy's case, there was more evidence.

The jury learned that Hennessy's worth as an employee tumbled in Penril's eyes after Burns became her supervisor nine months before her termination. Burns' evaluation of her was different than that of her previous boss, as indicated by the glowing letter, which we quoted earlier, sent by McFadden in July of 1991. The evidence that Burns was surprised to find Hennessy pregnant, believing her to be a "career woman," leads to all sorts of inferences that the jury could draw to conclude that Burns acted with reckless indifference to Hennessy's rights. When viewed this way, Burns telling Hennessy in February of 1992 "not to worry" about her probationary status while he was sending critical memoranda to his supervisor and others regarding Hennessy adds to the mix. In addition, the jury heard testimony that Penril's president, Mr. Johnson, did not want to hire women in the field because they get pregnant. We agree with the trial court that this evidence, when considered with the reasonable inferences flowing from it, is sufficient to support a jury award of punitive damages.

■ Finally, we get to the issue concerning the reduction in punitive damages from $300,000, as assessed by the jury, to $100,000, as determined by the court. In reducing the award, Judge Alesia was following the new statutory damage scheme in the 1991 Civil Rights Act which pegs a permissible award of compensatory and punitive damages to the size of the company guilty of discrimination. *See* 42 U.S.C. § 1981a(b)(3). The bigger the company, the more it pays. As applicable here, a company that employs more than 100 but less than 201 employees has its damage liability capped at $100,000. A company with between 201 and 500 employees faces a $200,000 cap. Judge Alesia found that Penril fit in the 100–201 range and reduced the jury award to the cap figure.

Regarding Penril's size, testimony was presented during the trial from Hennessy and Deborah Van Coutren, Penril's director of employee services. Ms. Van Coutren testified that the company had approximately 186 employees in April of 1992. Hennessy, who we know was a sales rep in the field, speculated that Penril had over 200 employees. In addition to this testimony, Hennessy urged the district court to take judicial notice of Penril's 10–K form filed with the Securities and Exchange Commission. The form noted that Penril had 398 employees as of July 31, 1992.

■ Judge Alesia declined to take judicial notice of the 10–K form under Rule 201 of the Federal Rules of Evidence. We think he made the right call on this point. In order for a fact to be judicially noticed, indisputability is a prerequisite. Given that there was considerable argument over the significance of the 10–K form, the judge properly found that its contents were subject to dispute. This conclusion is reasonable considering that the form covers three parts of Pen-

ril—the Datacomm Networks unit involved in this suit and two other parts of Penril not involved here, its Electro–Metrics division and its Technipower branch. Although we note that some courts have ruled that judicial notice of some SEC filings is appropriate, *see Southmark Prime Plus, L.P. v. Falzone,* 776 F.Supp. 888, 893 (D.Del.1991) (following *Kramer v. Time Warner Inc.,* 937 F.2d 767 (2d Cir.1991)), we believe that the fact in question here was not capable of accurate and ready determination by resort to the 10–K. This is not to say that the form could not have been creatively used by Hennessy for cross-examination purposes, but on the issue of judicial notice, we agree with the trial court. Based on the evidence presented in the case, the correct cap figure was $100,000. But Hennessy can't go to the bank with this sum just yet as another issue remains.

■ There are cases, of course, where courts have reduced a jury's award of punitive damages to the statutory maximum or cap provided in 42 U.S.C. § 1981a(b). *EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276 (7th Cir.1995), cited in our footnote to this opinion, is such a case. In *AIC* we upheld a district court's reduction of a punitive damages award under the ADA against an employer from $500,000 to $150,000 to fit a statutory cap of $200,000 in compensatory and punitive damages where the jury also awarded $50,000 in compensatory damages. *See also Selgas v. American Airlines, Inc.,* 858 F.Supp. 316, 326 (D.P.R.1994) (court reduced jury's award of $350,000 in punitive damages under Title VII to $300,000, the maximum award permitted against an employer with more than 500 employees; *Emmel v. Coca–Cola Bottling Co. of Chicago, Inc.,* 904 F.Supp. 723, 739–41 (N.D.Ill.1995) (court upheld a punitive damage reduction from $500,000 to $300,000, the maximum award permitted against an employer with more than 500 employees); *Hogan v. Bangor and Aroostook R.R.,* 61 F.3d 1034, 1037 (1st Cir.1995) (jury awarded $400,000 total in compensatory and punitive damages against employer; district court reduced award to $200,000 total—$100,000 each for compensatory and punitive damages—pursuant to § 1981a(b)'s cap; court of appeals reinstated

jury's award of $200,000 in compensatory damages and vacated the district court's award of $100,000 in punitive damages to keep total award at the cap). We have found no cases, however, where a court has determined that the statutory cap is too great an award and therefore reduced the award of compensatory and punitive damages to a figure below the statutory cap. But we believe this to be the kind of case where that sort of a reduction is appropriate.

■ When Congress permitted, for the first time, awards of compensatory and punitive damages in Title VII cases, it was concerned with keeping those damages under reasonable control. It did not want Title VII awards, especially of punitive damages, to be excessive as they can be in other areas of the law. We note, at this moment, that an issue regarding the possible excessiveness of a punitive damage award is presently before the Supreme Court in *BMW of North America Inc. v. Gore,* 646 So.2d 619 (1994), *cert. granted,* —— U.S. ——, 115 S.Ct. 932, 130 L.Ed.2d 879 (1995). In that case, an Alabama jury awarded a physician $2 million against the German luxury auto manufacturer, BMW, because one of its cars had a bad repaint job which was not disclosed at the time of the sale. During oral arguments in the case, Justice Stephen Breyer has been quoted as asking whether juries are free to use punitive damages "to transfer the total gross national product." While the punitive damages award in our case hardly raises those sorts of concerns, excessiveness is nevertheless something we must address under the new damage scheme in Title VII cases.

In fashioning new remedies under Title VII, Congress determined that a company the size of Penril, with more than 100 but less than 201 employees, should have to pay no more, in total compensatory (with back pay excluded) and punitive damages, than $100,000. It would seem logical, therefore, that the maximum permissible award against a company of Penril's size should be reserved for egregious cases. This is not unlike the sentencing scheme that existed prior to the

enactment of the Federal Sentencing Guidelines. Although a 20–year statutory maximum sentence may have been permissible for robbery, the maximum could only be reasonably imposed in a case where the facts were egregious or where the defendant had a bad record.

In our case, the jury, as we have seen, denied compensatory damages—pain and suffering, emotional distress, and that sort of thing—to Hennessy. The question then becomes whether 100 percent of the available damages to Hennessy in this case can be soaked up by a punitive damage award. We don't believe that it can. Although we believe, as we have noted, that the jury could have awarded punitive damages in this case, we do not think the case is so egregious that an award at 100 percent of what can legally be awarded against a company of Penril's size is appropriate. In fact, given the much more egregious nature of some sex discrimination cases—the legion of "quid pro quo" sexual harassment cases, like *Nichols v. Frank*, 42 F.3d 503 (9th Cir.1994) for example—we think the punitive damages must be reduced to a smaller figure. We will leave the ascertainment of just what that number should be to Judge Alesia, who performed his duties splendidly in this case.

In leaving this case, we hasten to add that requiring a second look, by the trial court, at the punitive damage award does not let Penril off on the cheap. It must pay Hennessy's attorneys $145,946.21 in fees and costs. It must reinstate Hennessy and give her $140,-191.36 in back pay, plus something extra for punitive damages as a kicker. Penril, therefore, has paid dearly for discriminating against Patricia Hennessy when it fired her on April 7, 1992.

For all of these reasons, we AFFIRM the judgment below in all respects except as to the award of punitive damages, and as to that award, we VACATE the judgment and REMAND the matter to the district court for further proceedings consistent with this opinion. No costs are awarded to either party.