**Mitzi BAKER, Plaintiff,**

v.

**Marvin T. RUNYON, in his official capacity as Postmaster General of the United States, Defendant.**

No. 95 C 4257.

United States District Court, N.D. Illinois, Eastern Division.

April 18, 1996.

As Corrected April 25, 1996.

Robert D. Whitfield, Chicago, Illinois, for Plaintiff.

Eileen Marutzky, Asst. U.S. Atty., Chicago, Illinois, for Defendant.

## MEMORANDUM ORDER

BOBRICK, United States Magistrate Judge.

Before the court is the motion of plaintiff Mitzi Baker for summary judgment on her claim for $275,000 in compensatory damages and $25,000 in punitive damages against defendant Marvin T. Runyon.

### I. BACKGROUND

Plaintiff filed her complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("1964 Act"), and the Civil Rights Act of 1991, 42 U.S.C. § 1981a, *et seq.* ("1991 Act"), alleging sex discrimination and retaliation. She seeks both compensatory and punitive damages against her employer, the United States Postal Service ("Postal Service"). The Postal Service has admitted liability in this case and the only issue is the amount of damages to which plaintiff is entitled.

This case stems from two administrative Equal Employment Opportunity Commission ("EEOC") complaints regarding sexual harassment on December 6, 1991, and November 25, 1992. The complaints were investigated and consolidated for an administrative hearing before an Administrative Law Judge ("ALJ"). Following the hearing, on June 14, 1994, the ALJ issued a Findings and Recommended Decision. The ALJ found that plaintiff had been subject to sexual harassment in the form of a hostile work environment, violations of medical restrictions, unwelcome sexual advances, and slanderous remarks of a sexual nature. The ALJ recommended, *inter alia,* that the Postal Service pay plaintiff an award of compen-

satory damages. On August 8, 1994, the Postal Service adopted the ALJ's decision and awarded plaintiff $50,000 in damages and $23,000 in attorney's fees. Plaintiff accepted the portion of the award grounded in attorney's fees, but appealed the damages award to the EEOC's Office of Federal Operations on September 6, 1994. When she received no response from the EEOC, plaintiff filed the instant complaint on June 25, 1995—more than nine months after filing her EEOC appeal.

## A. *Facts Underlying Complaint*

The defendant does not dispute the findings in the ALJ's Findings and Recommended Decision ("RD"). Accordingly, we draw our recitation of the underlying facts of this case from that document. Plaintiff's problems apparently began shortly after she received a requested assignment to the Graceland Annex Post Office in January of 1991. (RD at 8). She began to receive harassing and offensive phone calls, which she suspected were from a female coworker, Renee Hurley, regarding their involvement with a male coworker, Harold Grimette. (RD at 8). Plaintiff was also the victim of tampering at her work station in April of 1991. (RD at 8). She complained to the station manager, Robert Bisbee. (RD at 8). Hurley also began circulating a personal letter plaintiff had written to Grimette. (RD at 9). Plaintiff's supervisor, Rufus Moore, discussed and joked about the letter over the intercom. (RD at 9). Plaintiff again complained to Bisbee, but he propositioned her. (RD at 9).

Hurley continued to taunt, threaten, and harass plaintiff at work, and plaintiff continued to complain to Bisbee, Moore, and another supervisor, Stanley Brown, without results. Indeed, Brown continued to assign plaintiff to work with Hurley. (RD at 10). Brown also rebuked plaintiff over the loudspeaker. (RD at 12). Plaintiff also complained to, but was ignored by, Bisbee's supervisor, Baily–El. (RD at 10). Her supervisors instead would subject her to sexual remarks. (RD at 12, 16, 18). She also requested a transfer from, and complained to, John Frencher, the director of field operations at the Main Post Office, but was dismissed as a troublemaker. (RD at 11). The supervisors at her station began to assign her the heaviest routes in retaliation for her complaints through the chain of command. (RD at 11–12). She was threatened with suspensions when she failed to complete those routes. (RD at 11). She was refused assistance on those routes although others were granted requests for assistance. (RD at 13). Others were also not threatened with discipline when they brought back mail undelivered. (RD at 13). Plaintiff contacted EEO counselors on two occasions—following Bisbee's unwelcome advance in May of 1991, and in November of 1991 regarding a seven-day suspension and other harassment.

On January 15, 1992—a particularly cold day—Bisbee or Brown assigned plaintiff to a route with an unheated Postal Service vehicle. (RD at 13). The plaintiff complained to Bisbee, who merely laughed. (RD at 13). Plaintiff had to seek medical treatment for frostbite, which developed into plantar fascitis, a foot condition that required surgery and plaintiff's use of a cane. (RD at 13). Following this incident, plaintiff had certain medical restrictions that necessitated her being placed on light duty. Bisbee, however, told her she could not remain on light duty, and Brown assigned her to heavy mail routes outside of her restrictions and despite the fact that lighter routes were available. (RD at 14). These types of assignments apparently continued until plaintiff was finally transferred in August of 1992. (RD at 14–16).

As a result of these assignments, plaintiff's physical condition worsened. (RD at 17). The stress resulting from the situation prompted plaintiff to seek counselling at family clinic and an employee assistance program. (RD at 14). Plaintiff experienced severe mood changes and was depressed for long periods of time. (*Plaintiff's Motion for Summary Judgment,* Ex. 11). She becomes easily upset, breaks down into crying spells, and is unable to enjoy herself or normal social contact with others. (*Id.*). The ALJ concluded that plaintiff "was subjected to an unwelcome hostile environment of sexual and other harassment and acts of reprisal which

were inextricably caused by and were the direct result of the egregious hostile environment that the [Postal Service] failed to remedy ..." (RD at 38). Whereas the Postal Service "did not take prompt and sufficient action to correct the situation, and whereas as a result of that the [plaintiff] suffered physical and mental harm, stress, mental anguish and grief as well as various medical and monetary losses," the ALJ recommended that the Postal Service pay plaintiff "an award of compensatory damages for any such harm or loss incurred" after November 21, 1991, the effective date of the Civil Rights Act of 1991. (RD at 38); 42 U.S.C. § 1981a.

### B. *Parties' Positions*

Defendant submits that its administrative determination to award plaintiff $50,000 in compensatory damages is more than adequate. Defendant argues that punitive damages are unavailable; an argument we address and dismiss in a separate order. Defendant also argues that plaintiff's only physical injury—due to the frostbite she suffered—has been and will be compensated under the Federal Employees' Compensation Act ("FECA") and should not be considered in assessing her compensatory damages. Finally, defendant asks us to compare its $50,000 award with awards in comparable Title VII cases in this district which suggest that $50,000 is the upper limit of the range of awards. Defendant opines that the facts of this case are nowhere near the magnitude of the cases upholding or assessing $50,000 awards. Plaintiff essentially relies upon the ALJ's undisputed findings and description of defendant's conduct in maintaining her entitlement to compensatory and punitive damages in the amount of $300,000.

### II. *ANALYSIS*

#### A. *Compensatory Damages*

■ Plaintiff does not dispute that compensation for her frostbite injury is covered exclusively by FECA. Compensation for "injuries" under FECA, however, includes "in addition to injury by accident, a disease proximately caused by the employment ... and damage to or destruction of ... prosthetic devices ..." 5 U.S.C. § 8101(5). It is diffi-

cult to fit the harm plaintiff has suffered in this case into FECA's definition of "injury." The harm here arose from defendant's acts of sexual harassment and discrimination which were intentional, rather than accidental. *Nichols v. Frank*, 42 F.3d 503, 515 (9th Cir.1994). Like so much of this case, however, neither party addresses the issue of whether plaintiff's frostbite was an injury due to accident. Because plaintiff has sought and recovered compensation for her frostbite under FECA, we will not consider it in our assessment of compensatory damages, for we must avoid the prospect of double recovery. *Nichols*, 42 F.3d at 515–16. We will consider the "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses," 42 U.S.C. § 1981a(b)(3), that fall outside FECA's definition of injury. *Nichols*, 42 F.3d at 515.

The parties' presentation herein leaves another issue rather open—the time period for which compensatory and punitive damages may be assessed. Rather than fully address the issue of damages in the record or in a hearing, the parties have relied upon the ALJ's RD. The effective date of the Civil Rights Act of 1991 ("1991 Act"), as noted by the ALJ, was November 21, 1991. Because the ALJ was concerned with liability rather than damages, however, there is little in her RD regarding the chronology of events. It would appear, for instance that Bisbee's offer of assistance to plaintiff in exchange for sexual favors occurred prior to the effective date of the 1991 Act, *see supra at 3*, but that the malicious assignment of plaintiff to an unheated vehicle occurred after the effective date. *See supra at 4*. While we are less than confident in pinpointing events and dates, the ALJ's RD certainly establishes that the atmosphere of harassment, while perhaps varied, was consistent and pervasive both prior to and after the effective date of the 1991 Act. Plaintiff's claim for damages is, however, limited to a nine-month period from November 21, 1991 to August of 1992, when plaintiff was transferred from Graceland Annex.

■ In arguing for a limit of $50,000 in compensatory damages, given the nine-month period, defendant cites two cases:

**1304**

*U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.,* 823 F.Supp. 571 (N.D.Ill.1993) and *Probst v. Reno, et al.,* No. 94 C 691, 1995 WL 765261 (N.D.Ill. Dec. 26, 1995). In *AIC,* the court refused to overturn a jury award of $50,000 in a case where a terminally ill employee was discharged because of his illness. Because the employee was fired at such a time, the court felt the jury could consider the impact such a termination would have on an individual facing his impending death. 823 F.Supp. at 575. The defendant argues that plaintiff was not fired and points out that the plaintiff in *AIC* was robbed of his self-esteem, caused to worry about finances along with his impending death. In *Probst,* the plaintiff was subjected to harassment in retaliation for reporting racial discrimination to his superiors. He was placed under investigation for two years, received poor performance ratings, was disciplined and threaten with suspension. The court awarded $55,000 in compensatory damages for what it considered to be the most egregious year the plaintiff experienced. Defendant submits that, when the year in *Probst* is compared to the nine-month period in this case, a $50,000 damage ceiling is appropriate.

The plaintiff herein, as defendant points out, was not fired, was not terminally ill, and did not suffer compensable harassment for more than nine months. Distinguishing our case from the cited cases, however, is the fact that the harassment was of a nature and callousness that it resulted in actually physical injury. While we do not, as already noted, consider the injury itself, we can consider the mental anguish that resulted from working in such an atmosphere and for such supervisors; such supervisors who would not only cause such an injury but delight in it and exacerbate it by ignoring the resultant medical restrictions. Despite the injury and its medical restrictions, plaintiff had to go to work each day knowing that those medical restrictions would be exceeded, that she would be subject to additional physical pain,

and that complaints to authorities, no matter how high up, would only make her situation worse and would subject her to verbal abuse, perhaps over the loudspeaker for everyone's enjoyment. True, the plaintiff in *Probst,* like the plaintiff herein, suffered anguish over the fact that no matter how well he performed, he would receive poor ratings and be subject to discipline. Unlike the plaintiff, however, he did not have to work under the threat of physical abuse and pain that would result from supervisor's recurrent assignments exceeding his medical restrictions; restrictions that resulted from the conduct of those same supervisors. While plaintiff herein was not fired like the plaintiff in *AIC,* she nevertheless had to report to work for nine months as the target of hostility and work in a rancorous atmosphere that was fostered by the only people she could go to for help. We cannot accept defendant's contention that plaintiff's circumstances were "nowhere near the magnitude" of the individuals in *AIC* and *Probst.*[1]

That being said, we consider plaintiff's assessment of compensatory damages. Much of the record concerns the pain and treatment associated with plaintiff's physical injury which is not under consideration here. As the parties chose to stand on the ALJ's RD, there is of course no testimony regarding the anguish plaintiff felt during the pertinent period. It would appear, however, that plaintiff's circumstances compelled her to seek counselling after November of 1991. Beyond that, we note that, in her EEOC appeal, plaintiff assessed her compensatory damages at $120,000. This figure apparently included approximately $20,000 in medical bills incurred to treat plaintiff's frostbite which, again, we do not include in our quantification here. That would leave a figure of $100,000. Plaintiff offers nothing to explain how this figure became inflated to $275,000 from the time of her EEOC appeal until now.

---

1. We note that defendant seeks to portray plaintiff as a person who would not be affected adversely by the profane language to which she was subjected in the workplace by referring to plaintiff's own use of such language in a letter she wrote to Grimette. (*Defendant's Response to Plaintiff's Motion,* at 12–13). This argument is specious at best. Given the conduct to which plaintiff was subjected, profanity would have been the least of her worries. In addition, the language to which defendant refers in the said letter appears, for the most part, to be plaintiff's quotation of Grimette's language.

We have considered the RD, the record, such as it stands, and the parties' own evaluations of the appropriate amount of compensatory damages. We do not agree with defendant's attempt to diminish the harm plaintiff suffered, and can see, even from the dry record, that she did suffer a significant amount of anguish, almost on a daily basis, for an extended period. By the same token, we do not accept plaintiff's figure of $275,000, especially insofar as this represents nearly three times the amount of compensatory damages she originally sought. Considering all of these factors, we find the appropriate amount of compensatory damages to be $75,000.

### B. *Punitive Damages*

We turn to the assessment of punitive damages. Punitive damages are appropriate in case of callous disregard for a plaintiff's rights. *Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983) *cited in U.S. v. Balistrieri*, 981 F.2d 916, 936 (7th Cir.1992). Punitive damages are awarded to punish the defendant for outrageous conduct and deter him and others like him from similar conduct in the future. *Smith*, 461 U.S. at 54, 103 S.Ct. at 1639. Defendant disputes the availability of punitive damages in this case based on 42 U.S.C. § 1981a(b)(1), but we have addressed and rejected defendant's argument in a separate order. As the conduct herein, already described above, clearly evinced a callous disregard for plaintiff's rights, all that remains is to arrive at an appropriate amount for an award.

Plaintiff's request for punitive damages in this case has varied from $25,000 to $50,000. Because defendant does not believe punitive damages are available, he does not address the appropriate amount of punitive damages. In arriving at our assessment, we take note of the cap for total damages in this case under 42 U.S.C. § 1981a(b)(3)(D): $300,000. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1355 (7th Cir. 1995). Given our assessment of $75,000 in compensatory damages, the maximum award of punitive damages available would be $225,000. This maximum award must be reserved for only the most egregious cases. *Hennessy*, 69 F.3d at 1355–56. We also look to other cases for guidance. In the case defendant cited as an example of an adequate award of compensatory damages, for example, the Seventh Circuit upheld an aggregate punitive damage award of $150,000—three times the compensatory damage award— against an individual and the corporation of which she was the owner and chief officer. *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1287 (7th Cir.1995). Some other punitive damage awards from this circuit have ranged from $20,000 in *Sassaman v. Heart City Toyota*, 879 F.Supp. 901, 911 (N.D.Ind.1994), to a total award of $300,000 in *Emmel v. Coca–Cola Bottling Co. of Chicago, Inc.*, 904 F.Supp. 723, 729, 740–41 (N.D.Ill.1995), of which just $7,325 represented compensatory damages. In *Hennessy*, the court remanded the case for a reduction of a $100,000 award, which was the maximum available under the cap in that case. 69 F.3d at 1355–56.

*Hennessy* involved some instances of unwelcome sexual advances, but turned on the disparate treatment of plaintiff due to her pregnancy. The *Emmel* case, unlike the instant case, involved sexual discrimination in promotions. *Sassaman* is most analogous to the instant case. A sexual harassment case, it involved a course of conduct by several individuals, some whom were in management, encompassing insulting language and questioning, unwelcome touching, and differential treatment, all culminating in the plaintiff's termination. *Sassaman*, 879 F.Supp. at 908–909. Plaintiff's case is similar to *Sassaman*, but distinguishable in two respects: plaintiff was not discharged, and the course of harassment in *Sassaman* did not result in physical injury and the ignoring of medical restriction resulting from that injury. Thus the plaintiff in *Sassaman* did not have a threat of physical pain and exacerbation of an injury hovering over her head each day. In addition, *Sassaman* does not appear to have involved the pervasive atmosphere, condoned and encouraged by supervisors, in which an individual is treated as the sport of an entire workplace.

There is one additional factor we consider before arriving at our assessment. Defendant appears to be unrepentant for all that

has occurred. The supervisory personnel involved have not been disciplined because, according to defendant, the ALJ "did not direct the Postal Service to discipline the supervisors and managers, but rather ordered training for these management employees." (*Defendant's Response to Plaintiff's Motion,* at 15 n. 6). If the Postal Service requires an order to discipline the type of conduct that occurred here, there is every threat that it will allow it to occur in the future if undeterred. Hopefully, awarding punitive damages may well have a salutary effect in this regard. The defendant's attitude evinces a callous disregard of plaintiff's rights that echoes that of his supervisory personnel. Accordingly, considering the $20,000 award in *Sassaman,* the additional exacerbating factors present in this case, and plaintiff's own quantification of punitive damages at $25,000 to $50,000, we find a punitive damages award of $50,000 to be appropriate in this case.

### III. *CONCLUSION*

For the foregoing reasons, it is hereby ordered that the defendant pay plaintiff compensatory damages in the amount of $75,000, and punitive damages in the amount of $50,-000.

**DATE:** April 18, 1996