**Susan J. KOSCHOFF, Plaintiff,**

v.

**William J. HENDERSON, Postmaster General, United States Postal Service, Defendant.**

**No. Civ.A.98–CV–2736.**

United States District Court, E.D. Pennsylvania.

July 13, 2000.

Joan E. London, Reading, PA, for plaintiff.

Benjamin R. Barnett, AUSA, Philadelphia, PA, for defendant.

### MEMORANDUM DECISION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

Plaintiff Susan J. Koschoff filed this civil action on May 28, 1998 seeking damages arising from alleged discrimination, retaliation, and a hostile work environment while employed by the United States Postal Service[1] ("USPS"), in violation of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e–16. Discovery was completed on June 18, 1999, after which both parties moved for summary judgment. We denied Plaintiff's motion and granted partial summary judgment for Defendant on October 7, 1999. Remaining for trial were

---

1. Plaintiff's original Complaint named Marvin Runyon as Defendant. Because William J. Henderson had recently succeeded Runyon as Postmaster General, the caption has been changed per Fed.R.Civ.P. 25(d)(1).

Plaintiff's hostile work environment claim resulting from her employment at the Reading, Pennsylvania, Downtown Station facility ("DTS") from June, 1995, through November, 1996, and Plaintiff's retaliation claim resulting from her proposed separation from USPS on April 30, 1999.

We conducted a non-jury trial from April 3 through April 6, 2000, in Easton, Pennsylvania. After Plaintiff's and Defendant's brief opening statements, Plaintiff called George Cook ("Cook"), a letter carrier at DTS and grievance chairman of the National Association of Letter Carriers ("NALC") local which represented Plaintiff. Plaintiff also called Kenneth Rhoads ("Rhoads"), a letter carrier at DTS and NALC official; Sandra Williams ("Williams"), the Reading postmaster; Kimberly McKnight–Jimenez ("McKnight–Jimenez"), a co-worker of Plaintiff at DTS; Andrew Caporale, an expert vocational specialist; and Plaintiff herself. Defendant called Kevin Moyer ("Moyer"), one of Plaintiff's supervisors through April or May of 1996 and later station manager at DTS; and Judith Pelka ("Pelka"), one of Plaintiff's supervisors.

In lieu of closing arguments, we ordered the parties to submit proposed findings of fact and briefs. Based upon the parties' submissions, our evaluation of the evidence presented, and the credibility of the witnesses during the non-jury trial, we have made special findings of fact and conclusions of law. These are set forth more fully *infra*. See Fed.R.Civ.P. 52(a).

We dismiss Plaintiff's retaliation claim without prejudice. In regard to Plaintiff's hostile work environment claim, we grant judgment for Defendant.

## II. FINDINGS OF FACT

There is considerable disagreement between the parties regarding the events which took place while Plaintiff was employed at DTS between June, 1995 and November, 1996. We make the following special findings of fact: [2]

### A. Generally

1. Plaintiff began working for USPS in March, 1985. (4/3/00 tr. at 165.) She eventually became a letter carrier and worked at DTS during the relevant time period from June, 1995, to November, 1996. (*Id.* at 167, 175–76). Plaintiff stopped reporting for work at DTS on November 5, 1996. (*Id.* at 161–62; 4/5/00 tr. at 114–15.) She has not worked nor attempted to work since that time. (4/5/00 tr. at 118, 135.)

2. Plaintiff received normal pay and benefits for her position, including increases negotiated between USPS and NALC. (*Id.* at 136–37; Def. ex. 2 at 438–39, 442.)

3. During the relevant period, approximately five or six female letter carriers and thirty-two to forty male letter carriers were employed at DTS. (4/3/00 tr. at 38; 4/4/00 tr. at 84–85.)

4. Because DTS suffered from low performance and inefficiency, USPS managers instituted a strict, "by the book" management approach. This new approach resulted in increased labor problems, greater need for discipline, and more grievances. (4/4/00 tr. at 10–18.) Consequently, the working atmosphere at DTS was very unpleasant. (Def. ex. 113 at 27.) It was characterized by "[o]verbearing management, dictatorial attitude, no compassion for the workers [and a] tendency to single out certain people." (Def. ex. 112 at 29.) It was "unbearable.... It was almost like a prison.... [Employees] were treated like children." (Def. ex. 113 at 8–9.)

5. Management's treatment of Plaintiff was harsher than the treatment given

---

**2.** We have relied, to some extent, upon deposition testimony introduced into evidence by Defendant. Plaintiff was aware of the nature of this testimony but explicitly refrained from objecting to its admission. (4/3/00 tr. at 7, 11–12.) Plaintiff's acquiescence creates a presumption that the conditions of Fed.R.Civ.P. 32(a) exist. Therefore, we may consider the deposition testimony in lieu of live testimony. *See* 8A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2151 (2d ed.1994).

many other employees. It can fairly be characterized as harassment. (4/3/00 tr. at 37, 121–22; Def. ex. 113 at 10, 15, 16.) This treatment included being berated in front of other employees, (4/3/00 tr. at 125; Def. ex. 114 at 44–46), unusually strict supervision (discussed *infra*), unusually strict enforcement of the policy regarding leaving one's work area (discussed *infra*), and frequent reprimands. (4/3/00 tr. at 76–77, 134.)

6. Plaintiff was not the only employee harassed or treated more harshly than others. For example, we find credible the deposition testimony of Plaintiff's coworker Gary Bucher that six male mail carriers and a second female carrier were also subject to similar treatment. This treatment included heightened supervision, being talked down to, and being earmarked as "bad carriers." (Def. ex. 112 at 29, 58.) We also find credible the deposition testimony of Plaintiff's coworker Bonnie Sterling that as many as fifteen carriers (including Plaintiff) felt they were targeted by management. (Def. ex. 113 at 10, 32.) In addition, we find credible the deposition testimony of Harvey Kimble that at least four male and two female letter carriers (including Plaintiff) felt targeted by management. (Def. ex. 114 at 16–18, 44, 50, 53.)

We do not find credible the testimony of Plaintiff, (4/3/00 tr. at 197; 4/4/00 tr. at 94–95; 4/5/00 tr. at 98; Def. ex. 2 at 103), Cook, (4/3/00 tr. at 35–36, 36–37, 41, 44), and Rhoads, (4/3/00 tr. at 111–112, 114–15, 127; Pl. ex. 8), to the extent it implies that Plaintiff was the only employee subject to harsher treatment. We also do not find credible the testimony of McKnight–Jimenez that only women were harassed at DTS. (4/4/00 tr. at 60–61, 65–66.)

7. Plaintiff was inclined to fight management's unpleasant "by the book" style at DTS rather than acquiesce to it. (4/6/00 tr. at 20–21.) One of Plaintiff's doctors wrote that "she has some kind of war going on with her superiors." (Def. ex. 66 at 8/12/96.)

### B. Explicit Sexual Harassment

8. Plaintiff was not subject to explicitly sexual harassment in the course of her employment, including no sexually explicit language, (4/5/00 tr. at 110; Def. ex. 2 at 102, 160, 179–80), no sexual jokes told by supervisors, (Def. ex at 180–81), no sexual comments, (*id.* at 183) (notwithstanding the "bitch" and "little dyke" comments discussed *infra*), no sexual gestures, (*id.* at 181–82), no touching by any supervisor, (*id.* at 102, 159–60), no propositions or attempted social contact by any supervisor, (*id.* at 107–08, 160–161, 169; 4/5/00 tr. at 128), and no sexually explicit calendars, graffiti, photos, or sexual objects in her work space (except one picture discussed *infra*). (*Id.* at 177–78.) Even when one of Plaintiff's female supervisors wanted to meet Plaintiff alone, Plaintiff was not certain that the supervisor had sexual reasons for wanting to do so. (4/5/00 tr. at 127–28). *See also* Findings of Fact ¶ 20, *hereinafter* Facts ¶ 20.

9. In July or August of 1995, while in the presence of other letter carriers, Plaintiff was asked by a supervisor trainee, Jay Decker, "why is it that everyone thinks you're a bitch?" (4/5/00 tr. at 109, 133). Plaintiff did not consider this comment sufficient to warrant a complaint. (*Id.* at 134.) We find that Decker intended to demean Plaintiff, not merely to ask a question. Although Decker's particular choice of epithet would most certainly have been different had Plaintiff been a man, we find that Decker was not motivated by her gender.

10. We find credible the testimony of Cook and Rhoads that Moyer, who was one of Plaintiff's supervisors, referred to Plaintiff using crude epithets including "little dyke." (4/3/00 tr. at 55, 127; Def. Ex. 76 at 94.) We find credible the testimony of Cook and Rhoads that Moyer intended to made work difficult for homosexuals working under him both in the Army Reserve and at DTS. (4/3/00 tr. at 57, 126; Def. Ex.

76 at 94.) We do not find credible Pelka's testimony, (4/6/00 tr. at 87), and we find particularly un-credible Moyer's testimony, (*id.* at 61, 63), denying these allegations. While we express no opinion regarding the irrelevant issue of Plaintiff's sexual orientation, we find that Moyer's comment was motivated by his belief that Plaintiff was homosexual and by his intent to discriminate against homosexuals of either gender. (4/3/00 tr. at 127.)

11. Someone hung a picture of a woman's breasts in Plaintiff's work space toward the latter part of 1996. (4/5/00 tr. at 110, 134.) Plaintiff chose to ignore it, and two weeks later it had been removed. (*Id.* at 110–11, 134–35).

### C. Non–Substantive Job Performance

12. We find credible the testimony of Pelka that she never intentionally followed Plaintiff into the bathroom, with the exception of one incident when Pelka believed Plaintiff was ill. In that case, Pelka followed Plaintiff into the bathroom to offer assistance. (4/6/00 tr. at 79.) On this point, Pelka's testimony is consistent with Rhoads'. (4/3/00 tr. at 110–11.) On another occasion when Plaintiff was ill, Pelka gave her a ride home. (4/6/00 tr. at 76.) We do not find credible the testimony of Plaintiff that Pelka followed her into the bathroom on January 30, February 13, and February 29, 1996, (4/5/00 tr. at 156–57). We also do not find credible Plaintiff's similar deposition testimony in which she claims to rely upon her work diary for her recollection, (Def. ex. 2 at 53–56), because Plaintiff's work diary does not mention such events on those dates. (Def. ex. 23.) We do not find credible the testimony of Cook, (4/3/00 tr. at 48), and McKnight–Jimenez, (4/4/00 tr. at 62), to the extent they imply Pelka followed Plaintiff into the bathroom more than once.

13. We find credible the testimony of Pelka and Moyer that on another occasion, Pelka happened upon Plaintiff brushing her teeth in the bathroom, and that Plaintiff explained she did not have time to brush her teeth at home before work. (4/6/00 tr. at 52–53, 79–80.) We do not find credible Plaintiff's testimony denying that she made this explanation. (4/4/00 tr. at 106–07.)

14. In October, 1995, after the, tooth brushing incident, management met with NALC representatives (but without Plaintiff) regarding Plaintiff's use of the bathroom for personal hygiene. (4/3/00 tr. at 40–41, 68–69; 4/6/00 tr. at 80; Pl. ex. 3.)

15. We find credible the testimony of Plaintiff, (4/4/00 tr. at 102), Pelka, (4/6/00 tr. at 77–78), and Cook, (4/3/00 tr. at 67–68) that there existed at DTS a stated policy ("the policy") that letter carriers were to inform their supervisor (as opposed to seeking permission) when they left their work cases for any reason, including to use the bathroom. (*See also* Pl. exs. 19–20.) We do not find credible the testimony of Rhoads that there was no stated policy. (4/3/00 tr. at 106.)

We do not find credible the testimony of Plaintiff, (4/5/00 tr. at 148), Cook, (4/3/00 tr. at 38), and McKnight–Jimenez (4/4/00 tr. at 62), and the deposition testimony of Gary Bucher, (Def. ex. 112 at 40), and Bonnie Sterling, (Def. ex. 113 at 17), and a statement in Plaintiff's exhibit 21 to the extent that this evidence implies that the policy explicitly required letter carriers to seek permission before using the bathroom. However, we do find credible all this evidence to the extent it shows that management successfully created the impression amongst employees that they were required to seek permission from management before using the bathroom. (*See also* 4/6/00 tr. at 20.)

16. Plaintiff violated the policy on five occasions between July and September, 1995. (Pl. ex. 20). Moyer eventually suspended Plaintiff for seven days in part for these violations. (*Id.*) However, the suspension was never carried out pursuant to an agreement in which Plaintiff promised to leave a note if she stepped away from her case. (4/6/00 tr. at 51; Def. ex. 2 at 27.)

17. The policy was enforced more strictly against Plaintiff than against many other employees; however, Plaintiff was not the only employee to whom the policy was strictly applied. Six employees, including Plaintiff, another female carrier, and four male carriers, complained to the National Labor Relations Board about the policy and about NALC's acquiescence to it. (Def. exs. 20–21; 4/5/00 tr. at 147–149.) We find credible the testimony of Pelka that she applied the policy to Plaintiff and five male carriers who had violated the policy. (4/6/00 tr. at 78.) We find credible the testimony of Moyer that he applied the policy to at least two male violators. (*Id.* at 50–51.) We find credible the deposition testimony of Gary Bucher that the policy was applied to both Plaintiff and male employees. (Def. ex. 112 at 49, 61, 67–68.) We find credible the deposition testimony of Plaintiff's coworker Harvey Kimble that he was watched by management and was once personally cautioned about violating the policy. (Def. ex. 114 at 34, 61, 68.)

However, we also find credible the testimony of Cook, (4/3/00 tr. at 38), and the deposition testimony of Harvey Kimble, (Def. ex. 114 at 32, 34), that the policy was applied arbitrarily. Some letter carriers were allowed to ignore the policy while others (both men and women) were not.

We do not find credible the testimony of Plaintiff, (4/4/00 tr. at 102–103), Cook, (4/3/00 tr. at 38), and Rhoads, (*id.* at 106), and the deposition testimony of Bonnie Sterling, Plaintiff's co-worker at DTS, (Def. ex. 113 at 17–18), and the contention by Plaintiff in her grievance on the subject, (Pl. ex. 21 at 2), that this policy was *only* applied to Plaintiff. We do not find credible the testimony of Plaintiff, (4/4/00 tr. at 102–03), Cook, (4/3/00 tr. at 38), and McKnight–Jimenez, (4/4/00 tr. at 62–65), that the policy was *only* applied to women.

These employees did not necessarily know of enforcement actions taken against other employees. (4/6/00 tr. at 54–55; Def. ex. 2 at 30–31; Def. ex. 113 at 17–18.) McKnight–Jimenez, who made an effort to find out, merely asked "some of the [male] clerks," (4/4/00 tr. at 64). We do not find credible her testimony that she inquired of "every last one" of the male carriers. (4/4/00 tr. at 85.)

18. Moyer met with both Plaintiff and male employees to discourage loud talking and looking around instead of "casing" (sorting) mail. However, he did permit most carriers to talk quietly. (4/3/00 tr. at 199; 4/6/00 tr. at 54–55, 63–64; Def. ex. 2 at 29–30; Def. ex. 114 at 32.) Unlike most carriers, Plaintiff was prohibited from talking at all. (4/3/00 tr. at 200; 4/4/00 tr. at 96.) At least two male employees were given letters of warning for talking at their cases, (4/5/00 tr. at 155), although Plaintiff was not.

### D. Substantive Job Performance

19. We find credible the testimony of Pelka that at least some aspects of Plaintiff's substantive job performance were deficient. (4/6/00 tr. at 75–76.) We do not find credible testimony of Plaintiff to the extent it may imply that there was never a problem with her work. (4/4/00 tr. at 100–101.)

20. Moyer and Pelka wanted to meet alone with Plaintiff on several occasions to informally criticize Plaintiff's job performance. (4/3/00 tr. at 201–02; 4/4/00 tr. at 93; 4/6/00 tr. at 55, 92–93.) Plaintiff objected to meeting with her superiors alone and requested union representation. (4/3/00 tr. at 201; 4/6/00 tr. at 55). Plaintiff was fearful of meeting with Pelka alone. (4/4/00 tr. at 94–96.) Nevertheless, USPS and NALC had agreed that such discussions should be held in private, (Def. ex. 82 at 78), and Pelka insisted on a private meeting for that reason.

21. In July, 1995, management issued a warning letter to Plaintiff for not delivering enough mail based in part upon the "footage" (thickness) of mail delivered rather than the normal standard, which was an actual count of the number of pieces of mail delivered. (Pl. ex. 13;

4/3/00 tr. at 35, 191.) The warning was also based upon Plaintiff's unauthorized use of overtime. (Pl. ex. 13.) Management had attempted to employ a footage standard in the past, but had lost "arbitration after arbitration settlement" on that point. (4/3/00 tr. at 35.) This warning letter was withdrawn in a settlement agreement. (Pl. ex. 30; Def. ex. 7.) *See also* Facts ¶ 33.

22. In July, 1995, Plaintiff requested assistance in completing her route on a day in which both the volume of mail and the temperature were particularly high. (4/5/00 tr. at 92–94.) Requesting such assistance was not unusual. (*Id.* at 92–93.) Moyer was dispatched to assist Plaintiff, but observed her instead of assisting her. (*Id.* at 94–95.)

23. In September, 1996, Plaintiff was told by management that she need not deliver several parcels to a senior citizens' building because it was closed. (4/3/00 tr. at 115–18; 4/5/00 tr. at 104–07.) Despite this instruction, she received a disciplinary warning letter the next month for not having delivered the parcels. (Pl. ex. 31; 4/5/00 tr. at 108–109.)

24. Male and female employees were treated equally when management noticed problems with their substantive job performance. We find credible the testimony of Pelka that she did not speak differently to males and females when criticizing their substantive job performance. (4/6/00 tr. at 97.) We do not find credible the testimony of Plaintiff, (4/4/00 tr. at 100), or McKnight–Jimenez, (*Id.* at 72), that males were spoken to more politely than females. Moyer disciplined at least eight male letter carriers in writing while the only female he recalled disciplining was Plaintiff. (4/6/00 tr. at 48, 74–75.) Plaintiff knew of two male letter carriers who, like her, were disciplined for unauthorized overtime. (4/3/00 tr. at 193.)

### E. Enhanced Supervision

25. While casing mail, Plaintiff was supervised more closely than were other employees. (4/3/00 tr. at 108; 4/4/00 tr. at 70, 73, 100.) Indeed, at times a supervisor would stand only a foot away while Plaintiff cased her mail. (4/3/00 tr. at 52–53, 74; 4/4/00 tr. at 73.)

26. Plaintiff was subject to more street supervision than most other employees. (4/3/00 tr. at 37, 66, 197; Def. ex. 112 at 32–33.) However, we find credible the testimony of Pelka that the methods used in street supervision of Plaintiff were overt and were also used in supervision of other male employees. (4/6/00 tr. at 85–86.) We find not credible testimony of Plaintiff that the methods used to supervise her while delivering mail violated USPS policy and were unlike supervision of other employees. (4/3/00 tr. at 197.)

### F. Vacation Scheduling

27. Vacation policy was governed by the contract between USPS and NALC and by local rules established under that contract. (4/4/00 tr. at 32.) Management did not have discretion in allowing senior carriers up to two continuous weeks of vacation between the third week of May and late October (so-called "prime time"). (*Id.* at 32.) However, management did have discretion to approve or deny requests for more than two weeks of continuous vacation during prime time. Management's discretion was based upon factors such as staffing, avoiding excessive overtime, accommodating pregnant women and once-in-a-lifetime opportunities, and the type of precedent established. (*Id.* at 32–34.)

28. In February, 1996, Plaintiff requested that she be allowed to take four continuous weeks of her annual vacation time for a trip to Africa between May 20 and June 16, 1996. (Def. ex. 26.) Williams disapproved this request in part because she did not feel it was a once-in-a-lifetime opportunity. (4/4/00 tr. at 50–51.) Plaintiff had previously traveled abroad on several previous occasions. (4/5/00 tr. at 111; Def. ex. 66 (noting trips to Peru,

Mexico, Greece, and Turkey).) Staffing considerations were another legitimate, non-discriminatory reason for William's decision. (Def. ex. 27.) Plaintiff filed an informal equal employment opportunity ("EEO") complaint about this decision. (*Id.*)

29. Postmaster Sandra Williams approved and disapproved vacation requests from both males and females without regard to gender. (4/4/00 tr. at 35.) Plaintiff was unwilling or unable to provide examples of male carriers who had been granted similar vacation requests. (Def. ex. 27 at 1.)

### G. Grievances and Negotiations

30. Plaintiff filed an extraordinary number of union grievances regarding her treatment by management. (Def. ex. 17 (copies of 37 grievances); 4/5/00 tr. at 144 (estimating between 50 and 60 grievances); 4/3/00 tr. at 81 (noting 55 grievances); *id.* at 144, 152–53 (estimating 50 grievances in 1995 alone, out of 243 total grievances made by 220 active employees in the union local).) Plaintiff continued to file grievances even after she stopped working. (4/5/00 tr. at 145.) Plaintiff sometimes filed multiple grievances related to a single event. (4/3/00 tr. at 146–49.)

31. USPS procedure was to allow employees paid time to file grievances ("grievance time") as soon as administratively possible. (4/3/00 tr. at 22, 82, 114; 4/5/00 tr. at 95–96; 4/6/00 tr. at 56.) Management did so for other employees. (4/3/00 tr. at 99.) Plaintiff was frequently denied some of the grievance time she requested. (4/3/00 tr. at 42–43, 113–14, 146; 4/5/00 tr. at 95–97; 4/6/00 tr. at 57, 84.) Among Plaintiff's grievances were several regarding denial of paid time to file other grievances. (4/5/00 tr. at 96–97; Pl. exs. 6, 23, 24, 25.)

However, Plaintiff was allowed time to confer with union officials about each grievance. (4/5/00 tr. at 146.) At one point, Plaintiff was given nearly eleven hours of paid grievance time over eight days, which included over three hours of paid overtime. (Def. ex. 103; 4/6/00 tr. at 58, 84. *See also* Def. ex. 22.) Plaintiff received 13.5 hours of grievance time between February and April, 1996. (4/3/00 tr. at 145–46.)

We find that although management did deny Plaintiff adequate grievance time on isolated occasions, (4/3/00 tr. at 114, 146; 4/4/00 tr. at 95), Plaintiff abused the grievance process and requested more grievance time than necessary. Plaintiff was generally allowed adequate grievance time. (4/5/00 tr. at 98–99; 4/6/00 tr. at 57–58, 84).

32. Plaintiff told a psychologist that her filing of grievances caused management's harassment of her to escalate. (Def. ex. 72 "Initial Evaluation" at 1.) We make no findings regarding any management reaction to Plaintiff's EEO complaints.

33. In October, 1995, DTS management, NALC representatives, and Plaintiff met to discuss a resolution to Plaintiff's outstanding grievances and EEO complaints. As a result of this meeting, disciplinary actions against Plaintiff were withdrawn, and the grievances were resolved. (4/3/00 tr. at 45–47, 193–94; 4/4/00 tr. at 100–01; 4/5/00 tr. at 137; Pl. ex. 30; Def. ex. 2 at 91–93; Def. ex. 7.) Pursuant to the agreement reached at this meeting, Plaintiff agreed to leave a note at her work case before leaving to use the bathroom. (4/3/00 tr. at 194.)

34. In June, 1996, Williams and DTS management met with NALC representatives and Plaintiff to discuss Plaintiff's EEO complaints, but no resolution was reached. (Def. ex. 2 at 70–71.)

35. In August, 1996, as a result of Plaintiff's grievances, the parties agreed to schedule another meeting to resolve their differences through the Employee Assistance Program ("EAP"). (Def. ex. 8.; 4/4/00 tr. at 36–37; 4/5/00 tr. at 137–38.) EAP was designed to help USPS employees with personal problems, not settle labor disputes, but its use can be compelled

to resolve grievances. (4/4/00 tr. at 52–54.) Attempts to schedule the EAP meeting were delayed while Plaintiff complained (unsuccessfully) to the National Labor Relations Board regarding the conduct of both USPS and NALC in scheduling the EAP meeting. (Def. exs. 9–12; 4/4/00 tr. at 36–39; 4/5/00 tr. at 138–41.) Ultimately, the EAP meeting never occurred because Plaintiff refused to participate. (Def. exs. 13–15; 4/5/00 tr. at 141–44.)

## H. Timing of Plaintiff's Administrative Remedies

36. Plaintiff's informal EEO complaint 4C–175–1036–96, regarding denial of her vacation request, was filed on February 12, 1996. USPS denied her complaint in a letter dated April 10, 1997. (Def. ex. 27.) On May 8, 1997, USPS sent Plaintiff notice of her right to file a formal complaint, but this certified letter remained unclaimed by Plaintiff. (Def. ex. 28.) On June 9, Plaintiff acknowledged receiving actual notice of her right to file a formal complaint. (Def. ex. 27.) Plaintiff's formal complaint was received eight days later on June 17, 1997. (Def. ex. 28.) However, USPS considered May 8 to be the date of constructive notice. Consequently, on August 4, 1997, USPS dismissed Plaintiff's formal complaint because it was filed in excess of fifteen days after May 8. (Id.; see also 4/5/00 tr. at 157–159.) This complaint was later dismissed by an administrative law judge because it was superceded by the instant federal civil action. (Reply of Pl. to Def.'s Additional Findings of Fact, filed May 26, 2000, at 2.)

37. Plaintiff's informal EEO complaint 4C–175–1052–95 was filed on February 20, 1996. (Def. ex. 29.) On March 12, 1996, it was partially accepted by USPS for investigation (with regard to denial of grievance time, denial of union representation, being followed into the bathroom, and being forced to meet alone with a supervisor) and partially dismissed. (Def. ex. 30.) The parties have presented no documentary evidence that Plaintiff appealed the dis-

missed items, and we find that she did not. (4/5/00 tr. at 160.)

Plaintiff sought to delay consideration of the accepted items until she provided necessary detail and documentation, but after repeated requests she eventually proved unable to provide that information to the USPS EEO counselor. (Def. exs. 35–36, 39–41.) The complaint has been dismissed by an administrative law judge because they are also encompassed within the instant action. (Reply of Pl. to Def.'s Additional Findings of Fact, filed May 26, 2000, at 2.)

38. Plaintiff's informal EEO complaint 4C–175–1082–96 was filed on May 11, 1996. (Def. ex. 34.) Neither party has presented documentary evidence regarding any subsequent formal complaint. We find not credible Plaintiff's testimony that she filed a formal complaint. (4/6/00 tr. at 2–3.)

39. Plaintiff filed an informal EEO complaint on August 20, 1996 which was incorporated within complaint 4C–175–1082–96. (Def. ex. 38.) Neither party has presented documentary evidence that Plaintiff filed a formal complaint, and we find she did not.

40. Plaintiff filed an informal EEO complaint on June 9, 1997, some seven months after last working. (Def. exs. 47–48.) Neither party has presented documentary evidence that Plaintiff filed a formal complaint, and we find that she did not.

## I. Outward Effects upon Plaintiff

41. Between June, 1995, and November, 1996, Plaintiff's demeanor at work to changed from generally cheerful to generally sullen. (4/3/00 tr. at 122, 127; Def. ex. 112 at 36–37, 39; Def. ex. 113 at 16–17; Def. ex. 114 at 48–49.) Plaintiff suffered symptoms resulting from her work situation. (4/5/00 tr. at 112.)

42. Management's treatment of Plaintiff caused Plaintiff to cry on several occasions. (4/3/00 tr. at 77–78, 118, 142; 4/4/00

tr. at 74, 82–83; 4/6/00 tr. at 34; Def. ex. 113 at 17.)

43. Management's harassment affected Plaintiff more so than other employees. Plaintiff talked with coworkers about the "bathroom policy," but they generally laughed it off and told her to just go along with it and not make waves. Plaintiff was unwilling to do this, despite being well aware that she was making things more difficult for herself. (Def. ex. 67 at 9/10/96 progress note.) Plaintiff did not seek alternate employment at another USPS location or with another employer. (4/5/00 tr. at 135.)

### J. Medical Treatment and Evaluations of Plaintiff

44. Plaintiff had seen Dr. Jeffrey Hassel, M.D. four times in the previous two years for various conditions before seeking his treatment for work related stress. (4/6/00 tr. at 9–11; Def. ex. 66.) In August, 1996, Dr. Hassel excused her from work for three days. (Def. ex. 66.) Plaintiff visited Dr. Hassel again the next month, when she took exception to a "to whom it may concern" letter he had written diagnosing anxiety related syndrome but failing to find physical symptoms of stress. (4/6/00 tr. at 13; Def. ex. 66.) Dr. Hassel stood by his letter. Consequently, Plaintiff did not return to Dr. Hassel. (4/6/00 tr. at 13–14; Def. ex. 66.)

45. Plaintiff visited Bornemann Psychiatry Associates ("BPA") for individual counseling at least four times in August and September, 1996. (4/5/00 tr. at 113; 4/6/00 tr. at 14; Def. ex. 67.) BPA preformed a Beck Depression Inventory test on Plaintiff. (4/6/00 tr. at 14; Def. ex. 67.) After a September session which concluded with the BPA counselor trying unsuccessfully to convince Plaintiff to weigh the pros and cons of dropping her complaints, Plaintiff never returned. (4/6/00 tr. at 21–22; Def. ex. 67.)

46. At the recommendation of an attorney and of Dr. Raymond Kraynak, Plaintiff saw Dr. Saverio Laudadio, D.O., for twelve counseling sessions from October, 1996, through at least July, 1997. (4/5/00 tr. at 114; 4/6/00 tr. at 29–30; Def. ex. 73.) See also Facts ¶ 50. Dr. Laudadio did not excuse Plaintiff from work, nor did he recommend that she not work. We find credible the manuscript notes of Dr. Laudadio in which he quotes Plaintiff as believing she would not receive workman's compensation based on Laudadio's report, and in which he mentions that Plaintiff intended to seek the care of another physician. (Def. ex. 73.) In fact, Plaintiff did not see Dr. Laudadio again after this visit. (Id.) We do not find credible Plaintiff's denial of having made these statements, nor do we find credible her claim that she stopped seeing Dr. Laudadio because she lost her medical coverage. (4/5/00 tr. at 115–16; 4/6/00 tr. at 32–33.)

47. Dr. Laudadio diagnosed anxiety and depression caused by stress at work, (Pl. ex. 38 at 1), and evaluated Plaintiff using an "MMPI" test. (4/6/00 tr. at 30–31.) The results of that test were not flattering; among them was the conclusion that "[plaintiff] appears to be a hypersensitive person who is overly responsive to criticism.... Although she may be energetic and industrious ... her tendency to misunderstand and misinterpret the actions of others often leads to difficulties in her interpersonal relationships." (Def. ex. 73.) Plaintiff disagreed with these results. (4/6/00 tr. at 31–32.) On June 18, 1997, Dr. Laudadio recommended that Plaintiff could return to work if, among other conditions, the work stresses were resolved. (Pl. ex. 38 at 3.)

48. Plaintiff saw at least two other medical professionals for one visit each in September and October, 1996: Dr. Clancy McKenzie, M.D., and psychologist Rowena Fantasia–Davis. (Def. exs. 68, 72.)

49. Dr. Raymond Kraynak, D.O., practices in Plaintiff's home town of Mount Carmel, Pennsylvania, one and one-half hours from Plaintiff's residence in Reading. (4/6/00 tr. at 4, 24.) He knows Plain-

tiff socially and has treated numerous members of her family. (Kraynak dep. at 61–62.) Plaintiff did not see Dr. Kraynak regularly before seeking treatment for work-related stress in October, 1996. (4/5/00 tr. at 114; 4/6/00 tr. at 23–24; Kraynak dep. at 18–20.) She saw him again in November, 1996, just three days before the last day she worked. (Kraynak dep. at 19–20.)

50. On November 5, 1996, Dr. Kraynak wrote a "to whom it may concern" letter diagnosing Plaintiff with anxiety depressive neurosis and job related stress syndrome. He prescribed medicine for this condition. (Def. ex. 71.) Dr. Kraynak believed Plaintiff was unable to work and recommended she not do so. (4/5/00 tr. at 115; Kraynak dep. at 22, 26.) Plaintiff stopped working (took "medical leave") that very day and has not worked since. (4/3/00 tr. at 161–62.) Dr. Kraynak proposed another visit with Plaintiff a month later, although there is no evidence that that visit occurred. (Def. ex. 71.) Dr. Kraynak did not receive updates on Plaintiff's condition from Dr. Laudadio, whom he recommended that Plaintiff see. (Kraynak dep. at 16.) Plaintiff finally saw him again seven months later in June, 1997, and thereafter nearly every month through February, 1999. (Kraynak dep. at 26–46.)

51. In a second letter approximately one year later in November, 1997, Dr. Kraynak reiterated his opinion that Plaintiff could not work because of job related stress. (Def. ex. 71.)

52. Also in November, 1997, Dr. Victor Bove, D.O., saw Plaintiff and diagnosed major depressive disorder and posttraumatic stress disorder. Dr. Bove made no recommendation regarding Plaintiff's return to work. (Pl. ex. 37.)

### K. Damages

53. We decline to make any findings of fact regarding damages or the testimony of Andrew Caporale. As will be apparent, such findings are not required.

## III. DISCUSSION

### A. Plaintiff's Retaliation Claim.

■ As we noted in denying Defendant's motion for summary judgment on Plaintiff's retaliation claim, Plaintiff's dismissal from USPS is still pending a union grievance and therefore is an incomplete act not yet ripe for adjudication. (Mem. and Order, filed October 7, 1999, at 26.) Nevertheless, considerations of judicial efficiency kept us from dismissing the retaliation claim at that time; we had anticipated that it might ripen to be tried along with the hostile work environment claim. At the time of trial on the hostile work environment claim, however, Plaintiff's dismissal was not yet finalized. Therefore, the retaliation claim could not yet be tried. At the start of trial, the parties agreed to proceed only with the hostile work environment claim. (4/3/00 tr. at 3–4). Consequently, because judicial efficiency no longer provides us a rationale to allow this unripe claim, we will dismiss it without prejudice.

### B. Plaintiff's Administrative Remedies

■ "It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief." *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir.1997) (citing *McKart v. United States* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)). Equal Employment Opportunity Commission ("EEOC") regulations define those administrative remedies for federal employees who would become Title VII plaintiffs. *See* 42 U.S.C. § 2000e–16(b). They require an aggrieved federal employee (including Postal Service employees, *see* 42 U.S.C. § 2000e–16(a); 29 C.F.R. § 1614.103(b)(3)) to contact an agency counselor within forty-five days of an alleged incident in order to resolve the problem informally. *See* 29 C.F.R. § 1614.105(a)(1). If this informal complaint is not resolved within thirty days, a

plaintiff has fifteen additional days to file a formal EEOC complaint. *See* §§ 1614.105(d), 1614.106(b).

Then, within ninety days after final action by the EEOC (or within 180 days after the formal complaint if the EEOC has not acted), the employee may bring a civil action under Title VII. *See* 42 U.S.C. § 2000e–16(c); *see also* 29 C.F.R. § 1614.407. A Title VII suit is the sole judicial remedy for a complaint of employee sex discrimination by agencies such as the Postal Service. *See Robinson,* 107 F.3d at 1020–21.

■ These time limits are not jurisdictional; they are akin to statutes of limitation. *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (regarding EEOC regulations); *Robinson,* 107 F.3d at 1021 (citing *Hornsby v. United States Postal Service,* 787 F.2d 87 (3d Cir.1986)) (regarding Title VII). Accordingly, they are subject to tolling, waiver, or estoppel. *See Zipes,* 455 U.S. at 393, 102 S.Ct. 1127 (regarding EEOC regulations); *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) (regarding Title VII); 29 C.F.R. § 1614.105(a)(2) (allowing equitable tolling). Like statutes of limitation, the time limits constitute an affirmative defense to Title VII actions. *See Williams v. Runyon,* 130 F.3d 568, 573 (3d Cir.1997).

■ Regarding complaint 4C–175–1036–96 (denial of Plaintiff's vacation request), we need not decide when Plaintiff had notice of her right to file a formal complaint and consequently whether the formal complaint was filed in a timely manner. Assuming, *arguendo,* that it was, Plaintiff still did not file the instant action until May 28, 1998, more than ninety days from the date the formal complaint was denied (August 4, 1997). *See* Facts ¶ 35. Therefore, the instant action exceeds the

time limits imposed by both Title VII and the EEOC regulations.

Regarding complaint 4C–175–1052–95, Plaintiff did not appeal the dismissed items within ninety days of their denial by USPS (March 12, 1996). *See* Facts ¶ 37. Hence, they also exceed the time limit of the EEOC regulations.

Because there was no resolution of the accepted items in this complaint (regarding denial of grievance time, denial of union representation, being followed into the bathroom, and being forced to meet alone with a supervisor), Plaintiff had 180 days from February 20, 1996, to bring this action. She did not do so. *See* Facts ¶ 37. We conclude, therefore, that these items exceed the time limits of both Title VII and the EEOC regulations.

Plaintiff's informal complaints 4C–175–1082–96 filed on May 20 and August 11, 1996 did not reach the formal complaint stage. Even allowing the later date for all the claims, the administrative time limit to formalize such a compliant has long ago passed. *See* Facts ¶¶ 38–39. Similarly, Plaintiff's unnumbered informal EEO complaint of June 9, 1997 was not formalized within the time limit. *See* Facts ¶ 40. These complaints, too, are time-barred by the EEOC regulations.

■ While Defendant did assert an untimeliness defense for these claims in the Answer, he did not ask us to consider this defense when seeking Summary Judgment. (Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J., filed Aug. 2, 1999). In granting partial summary judgment for Defendant, we pointed out *sua sponte,* without deciding, the possibility that these claims were untimely under both the EEOC regulations and Title VII. (Mem. and Order, Oct. 7, 1999, at 19 n. 14.) Despite this comment, Defendant inexplicably allowed the case to go to trial without addressing this issue.[3] Defendant fi-

---

3. Had Defendant made a second summary judgment motion with the same evidence that was presented at trial, we would have been

obligated to reach this same conclusion. By failing to argue for this defense until his concluding brief, Defendant's counsel forced a

nally argued this defense in his concluding brief. While such a defense may be waived if first argued after trial, *see, e.g., Bradford–White Corp. v. Ernst & Whinney,* 872 F.2d 1153 (3d Cir.1989), Defendant's brief was in lieu of a closing argument and must be considered part of the non-jury trial.

Plaintiff has offered no credible evidence contrary to our findings of fact regarding the use and timing of Plaintiff's administrative remedies. *See* Facts ¶¶ 36–40. Moreover, Plaintiff has not offered evidence which would support equitable tolling, estoppel, or waiver of the time limits. Thus, we find Plaintiff's instant action was filed too late to meet the administrative requirements required of her EEO complaints, and we grant Defendant judgment based in part on the non-exhaustion and untimeliness of Plaintiff's administrative remedies. Nevertheless, we emphasize that we have reached our ultimate decision based primarily upon the merits of the case, and only secondarily upon these procedural issues.

### C. Plaintiff's Claim of a Hostile Work Environment

■■ Title VII's prohibition of employment discrimination on the basis of gender [4] is the same for both the federal government and private employers. *See Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999). It prohibits gender discrimination in the workplace in the form of harassment "sufficiently severe or pervasive [so as] 'to alter the conditions of [the victim's] employment and create an abusive work environment.'" *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting

*Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)) (second alteration in original). *See also Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Generally, we must consider all the circumstances regarding a plaintiff's employment, including the frequency and severity of any discriminatory conduct, the physically threatening or humiliating or offensive nature of such conduct, and the effect on the plaintiff's performance and psychological well-being. *See id.* at 23, 114 S.Ct. 367. Such claims are frequently referred to as "hostile work environment" claims.

■ The Third Circuit requires a plaintiff meet five conditions to establish a hostile work environment claim: "(1) the employee[ ] suffered intentional discrimination because of [his or her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." *Andrews v. City of Phila.,* 895 F.2d 1469, 1482 (3d Cir.1990) (footnote omitted). We will examine each of these five constituents in turn.[5]

### 1. Intentional Gender Discrimination

Where inherently asexual acts (as opposed to, e.g., sexual propositions or displaying pornography) are alleged to have been committed on the basis of the plaintiff's gender, the Third Circuit allows a finding of intentional gender discrimination, but a fact intensive analysis is necessary. *See Andrews,* 895 F.2d at 1482 n. 3,

---

four-day trial which might easily have been avoided.

**4.** The Third Circuit uses the terms "sex" and "gender" interchangeably in referring to Title VII discrimination. *See Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 148 (3d Cir.1999).

**5.** Plaintiff mistakenly relies upon *Baker v. Runyon,* 922 F.Supp. 1300 (N.D.Ill.1996), to

demonstrate she has proven the five *Andrews* elements. (Br. of Argument of Pl., Susan J. Koschoff, at 9–10, filed May 2, 2000.) However, *Baker* merely addressed the issue of damages against a defendant who had already admitted liability. *Baker* described neither the legal standard for liability nor how that standard was met.

1485. A plaintiff must show that her gender was a "substantial factor" leading to the discrimination and that her treatment would have been different were she a man. *See id.* at 1485.

▮▮▮▮ Verbal and physical harassment, no matter how unpleasant and ill-willed, is simply not prohibited by Title VII if not motivated by the plaintiff's gender (or membership in other protected groups). *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). *See also, e.g., Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir.1994). Hence, mistreatment and disrespect unmotivated by the plaintiff's gender does not create a hostile work environment. *See Afrassiabian v. ProCredit Holdings, Inc.,* No. CIV. A.98–4757, 1999 WL 605589 at \*23 n. 7 (E.D.Pa. Aug.9, 1999).

▮▮▮▮ Similarly, conduct motivated by a bad working relationship is not gender discrimination. *See Young v. Houston Lighting and Power Co.,* 11 F.Supp.2d 921 (S.D.Tex.1998). Nor are an employer's actions when based upon a belief, even if mistaken, that an employee was insubordinate or otherwise acted improperly. *See Burke v. Sears–Roebuck Co.,* No. CIV. A.98–4364, 1999 WL 358915 at \*2 (E.D.Pa. June 2, 1999). Likewise, seemingly discriminatory behavior when actually motivated by personal animosity is not prohibited by Title VII. *See Succar v. Dade County Sch. Bd.,* 60 F.Supp.2d 1309, 1314 (S.D.Fla.1999). Moreover, simple teasing and offhand comments, even when they are motivated by gender, are not by themselves sufficient to constitute a hostile work environment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

▮▮▮▮ Nevertheless, a "tangible employment action" (i.e., dismissal) is not required to show discrimination. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 766, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

What types of asexual acts *do* amount to intentional gender discrimination are perhaps best illustrated by example. In *Hurley v. Atlantic City Police Dep't,* 933 F.Supp. 396, 408 (D.N.J.1996), *aff'd,* 174 F.3d 95 (3d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000), a male supervisor's denial of a female employee's vacation requests, giving her undesirable assignments, undercutting her authority, abusing her orally in front of other employees, and attempting to transfer her were together sufficient to support a finding of Title VII liability. A supervisor's criticism may also be considered in a Title VII claim. *See Harper v. Robert J. Casey & Assocs.,* No. CIV.A.95–7704, 1998 WL 614768 at \*8 (E.D.Pa. Sept.14, 1998).

In *Spain v. Gallegos,* 26 F.3d 439, 447–48 (3d Cir.1994), a male supervisor encouraged false rumors that a female subordinate was having an affair with him. When the subordinate was ostracized and denied a promotion, these facts were sufficient to make out the first prong of the *Andrews* test.

▮▮▮▮ In the instant matter, Plaintiff was not denied pay or arbitrarily denied benefits, *see* Facts ¶¶ 2, 26–27, but was certainly intentionally targeted for harassment by management at DTS. *See* Facts ¶ 4. The harassment included discussing Plaintiff's bathroom habits with NALC officials, enhanced enforcement of policies regarding talking at or leaving the work case, pressuring Plaintiff to meet alone with supervisors, evaluating Plaintiff using unconventional standards, refusing to render assistance in circumstances under which it was usually given to other carriers, arbitrarily changing specific instructions, enhanced and intimidating supervision, and occasionally denying grievance time. *See* Facts ¶¶ 5, 14, 17, 20–23, 25–26. It did not include following her into the bathroom or materially different street supervision from that given other employees. *See* Facts ¶¶ 12, 13, 18, 26.

Harassment which is sexual in nature is per se motivated by gender. However, harassment of Plaintiff was not of a sexual nature, *see* Facts ¶¶ 8–10, except for one isolated and relatively minor incident. *See* Facts ¶ 11. (Respondeat superior liability does not exist for that incident, as discussed *infra.*) Therefore, we have conducted a "fact intensive analysis" to examine if the harassment was motivated by Plaintiff's gender.

One indication that harassment was motivated by gender might be a difference in the way men and women were treated. At DTS, management did indeed harass certain women, primarily Plaintiff. However, the evidence demonstrates that DTS management also harassed men in roughly the same proportion. *See* Facts ¶¶ 6, 17, 18, 24, 29. We conclude that any differential treatment of women and men at DTS is insufficient to demonstrate that the harassment of Plaintiff was motivated by her gender.

Nevertheless, such a conclusion does not address the possibility that Plaintiff in particular was harassed because of her gender. Our fact intensive analysis of the entire course of events, however, reveals no direct evidence of her supervisors' gender-based motives. Moreover, we have found no indirect evidence which would allow such an inference to be drawn. We have found no credible evidence that gender was a factor, much less a substantial factor, in the harassment that Plaintiff and other employees suffered at the hands of DTS management.

While we do not decide the reasons why Plaintiff was harassed, the evidence does suggest several possible non-gender related reasons for management's treatment of Plaintiff. These may include Plaintiff's unwillingness to cooperate with management's strict by-the-book style, *see* Facts ¶¶ 7, 16, perceptions of Plaintiff's sexual orientation,[6] *see* Facts ¶ 10, or Plaintiff's proclivity for filing grievances. *See* Facts ¶ 32. Plaintiff was harassed, but she has failed to prove that the harassment was because of her gender.

### 2. Pervasive and Regular Discrimination[7]

■ To form a hostile work environment, the workplace must be "permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (quoting *Vinson,* 477 U.S. at 67, 106 S.Ct. 2399). Pervasive harassment is that which occurs regularly or when incidents are in concert with one another. *Andrews,* 895 F.2d at 1484 (citing *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987)). Generally, more severe discriminatory acts need be less frequent to be considered pervasive. *See* 458 *Am. Jur.2d* Job Discrimination § 968 (1983).

■ Generally, only the most serious of isolated incidents can rise to the level required by Title VII for a hostile work environment. *See Faragher,* 524 U.S. at 788, 118 S.Ct. 2275. Even nine events may not constitute regular and pervasive discrimination when they extend over three years, lack a common theme, involve different people, and are not concerted actions. *See Johnson v. Souderton Area Sch. Dist.,* No. CIV.A.95–7171, 1997 WL 164264, at *6 (E.D.Pa. Apr.1, 1997). However, several offensive comments made to a plaintiff and other women throughout one year may be regular and pervasive.

---

**6.** We do not mean to imply any endorsement of Moyer's gay-bashing comments. *See* Facts ¶ 10. Such threats, particularly from a USPS station manager, are uncalled for. In this Court's opinion, they reflect extremely poorly upon both Moyer and USPS. However, discrimination based upon sexual orientation is not yet prohibited by Title VII.

**7.** As noted in *Bouton v. BMW of N. Am.,* 29 F.3d 103, 106 n. 2 (3d Cir.1994), the Third Circuit's "pervasive and regular" standard in *Andrews,* 895 F.2d at 1482, differs from the Supreme Court's "severe or pervasive" standard in *Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. 2399. Were we to use the latter standard, however, our holding would be identical.

*See Herkalo v. National Liberty Corp.*, No. 94–CV–7660, 1997 WL 408325, at *8 (E.D.Pa. July 22, 1997).

While the evidence does not reflect specific dates for the incidents which harassed Plaintiff, it is clear that they were frequently day-to-day, ongoing events. Moreover, Plaintiff's many grievances and EEO complaints span most of the relevant time period. *See* Facts ¶¶ 31, 33–35. Accordingly, we find that the harassment was pervasive and regular.

### 3. Subjective Effect of Discrimination on Plaintiff

This prong is crucial to establish that a particular plaintiff suffered injury warranting judicial relief. *See Andrews*, 895 F.2d at 1483. Such effects may include being forced to resign or suffer emotional trauma, *see id.* at 1484, but serious psychological harm is not required. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Moreover, the effects need not be economic. *See id.* at 21, 114 S.Ct. 367.

The evidence of the change in Plaintiff's disposition and of Plaintiff's crying as a result of workplace harassment is clear. *See* Facts ¶¶ 41–42. Although we do not decide whether Kraynak's deposition is admitted as expert testimony, we note that Doctors Kraynak, Laudadio, and Bove all found Plaintiff to have been detrimentally affected by her work. *See* Facts ¶¶ 47, 50–52.[8] We conclude there was a subjective effect on Plaintiff.

8. Although our decision will not require damages to be awarded, we feel compelled to comment upon the process by which Plaintiff obtained a medical excuse from work for the past three and one-half years. The evidence indicates that Plaintiff visited not less than five medical professionals for her work-related condition before Dr. Kraynak told her she should not work. *See* Facts ¶¶ 44–48. Among these five, she stopped going to her regular physician (Dr. Hassel) after he refused to change his diagnosis to her liking. *See* Facts ¶ 44. When BPA suggested that her mental health might improve if she dropped

### 4. Objective Effect of Discrimination

The objective prong of the *Andrews* test for a hostile work environment puts a check on the overly sensitive plaintiff who is unreasonably affected by acts of discrimination. *See Andrews*, 895 F.2d at 1483. Evidence that others were harassed may tend to show that a plaintiff's claims are objectively reasonable. *See West v. Philadelphia Elec. Co.*, 45 F.3d 744, 757 (1995).

DTS management's harassment of other employees, *see* Facts ¶¶ 6, 17, indicates that Plaintiff's claims of harassment are not entirely unreasonable. However, the effect the harassment had upon Plaintiff would not have been suffered by a reasonable woman in Plaintiff's position. Plaintiff was hypersensitive, abnormally responsive to criticism, and prone to misunderstand the actions of others. *See* Facts ¶ 47. She would not ignore the harassment the way many of her coworkers did. *See* Facts ¶ 43. Even when advised to do so by medical professionals, she refused to consider the pros and cons of dropping her complaints. *See* Facts ¶ 45. We conclude that Plaintiff has failed to show that the harassment she suffered would have been so severe or pervasive so as to change the conditions of a reasonable female letter carrier's employment.

### 5. Respondeat Superior Liability

 Common law principles of agency apply to limit employers' liability for their agents in Title VII actions. *See*

her complaints, she never returned. *See* Facts ¶ 45. With Dr. Laudadio, she was more explicit: she told him she would not continue under his care because his report would not get her workers' compensation. *See* Facts ¶ 46.

Plaintiff eventually got Dr. Kraynak, an old family friend whose office was an hour and a half away, to recommend that she no longer work. While we do not decide if Plaintiff's alleged inability to work is legitimate, we do take note of Plaintiff's efforts in making her choice of a physician.

*Meritor,* 477 U.S. at 72, 106 S.Ct. 2399. Nevertheless, where a hostile work environment is created by an immediate or successively higher supervisor, a prima facie case of vicarious liability by the employer exists per se. *See Burlington Indus.,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. Such is clearly the case for the asexual harassment of Plaintiff, and a prima facie case for respondeat superior liability clearly exists for these events.

However, no credible evidence has been presented that the posting of the picture of the woman's breasts, *see* Facts ¶ 11, was done or condoned by management. Moreover, Plaintiff did not complain to management about this incident. Therefore, we find that no prima facie case for respondeat superior liability exists for the posting of the picture of the woman's breasts.

▇▇ An employer may assert an affirmative defense to respondeat superior liability if no tangible employment action (such as discharge) is taken. Such a defense requires that: (a) the employer reasonably tried to prevent and correct the harassment, and (b) the employee unreasonably failed to take advantage of the prevention and corrections offered by the employer. *See Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

As an affirmative defense, Defendant's argument that it tried to resolve Plaintiff's grievances is required by Federal Rules of Civil Procedure 8(c) and 12(b) to be pleaded in the Answer. Defendant has failed to do so. (Answer at 5–6). Although both Plaintiff and Defendant have argued and presented evidence relevant to this defense at trial without objection, *see* Facts ¶¶ 33–35, such evidence is also relevant to the prima facie case. Hence, we decline to hold that the affirmative defense has been tried with the "express or implied consent of the parties," Fed.R.Civ.P. 15(b), and we will not treat the pleadings to have been amended to conform to the evidence presented.

However, even if we were to allow this affirmative defense, we would find that Defendant had failed to meet his burden of proof. Although Plaintiff did indeed refuse to participate in the EAP process, *see* Facts ¶ 35, the ongoing nature of the harassment throughout the relevant time period indicates that USPS did not reasonably try to prevent and correct the situation. Hence, we find that respondeat superior liability exists with regard to this harassment.

### D. Conclusion

We dismiss Plaintiff's retaliation claim without prejudice. We hold that Plaintiff's hostile workplace environment claim fails for three independent reasons. First, Plaintiff's administrative remedies were not pursued or not pursued on a timely basis. Second, Plaintiff has not proven that gender motivated her mistreatment by USPS. Finally, Plaintiff has not proven that the harassment she suffered would also have detrimentally affected a reasonable woman in Plaintiff's position. Thus, we grant judgment to Defendant on the hostile workplace environment claim.

### IV. CONCLUSIONS OF LAW

Consistent with the above findings of fact and discussion, we make the following conclusions of law:

1. Our federal question jurisdiction is based upon 28 U.S.C. § 1331, 42 U.S.C. § 2000e–16(c), and 29 C.F.R. § 1614.407.

2. Plaintiff's retaliation claim is not ripe.

3. Plaintiff has not satisfied the administrative time limits imposed by 42 U.S.C. § 2000e–16(c) and 29 C.F.R. §§ 1614.105(d), 1614.106(b), and 1614.407.

4. Plaintiff has proven that she was intentionally harassed by Defendant.

5. Plaintiff has failed to prove such harassment was because of Plaintiff's gender.

350

6. Plaintiff has proven the harassment was pervasive and regular.

7. Plaintiff has proven the harassment had a subjective effect upon Plaintiff.

8. Plaintiff has failed to prove that the harassment would have had a detrimental effect upon a reasonable woman in Plaintiff's position.

9. Plaintiff has proven that respondeat superior liability existed for the asexual harassment conducted by Plaintiff's USPS supervisors.

10. Plaintiff has failed to prove that respondeat superior liability existed for any sexual harassment.

11. Defendant's affirmative defense regarding respondeat superior liability was not pleaded and is not considered.

12. Nevertheless, Defendant has failed to prove his affirmative defense to respondeat superior liability.

13. Plaintiff has failed to satisfy her burden of proof for her hostile work environment claim.

14. Plaintiff is not entitled to relief.